COMMONWEALTH *vs.* RANDALL W. TRAPP.

Middlesex.   September 9, 1985. — November 13, 1985.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Evidence,* Other offense, Hearsay, Business record, Relevancy and mater-
iality, Expert opinion. *Constitutional Law,* Self-incrimination. *Judge.*

At the trial of a murder case in which the defense of insanity was raised, there
    was reversible error in the admission of evidence that four years before
    the murder the defendant had made threats against persons other than
    the victim, and in the admission of three disciplinary reports respecting
    the defendant's conduct while he was detained in a house of correction
    awaiting trial, where evidence of the threats, and at least one of the
    reports, was not probative of the defendant's sanity, as claimed by the
    Commonwealth, and where the hearsay disciplinary reports were not
    admissible as business records under G. L. c. 233, § 78. [205-210]
At the retrial of a criminal case, the prosecutor, in cross-examining an expert
    witness for the defense, should not ask questions indicating that the
    defendant had previously been in jail, unless it is impossible to impeach
    the expert's testimony without asking these questions. [211]
There is no prerequisite that an expert witness in a criminal case testify that
    the accused is psychotic before that expert may offer an opinion on
    criminal responsibility, so long as the testimony relates to a mental
    disease or defect. [211-212]
A criminal defendant's privilege against self-incrimination was not violated
    when he was ordered to furnish to the prosecutor certain psychiatric and
    medical reports and records, where the initial order required the results
    of tests which were not testimonial in nature, and where the order
    requiring production of reports based, in part, on the defendant's state-
    ments was made only after it had become clear that the defendant's
    experts would testify extensively on such basis. [212]
On appeal of a criminal case in which during jury deliberations the trial judge
    had been absent on the return of the jury for questions and for delivery
    of the verdict and had been replaced by two other judges, this court
    expressed the view that the requirements of Mass. R. Crim. P. 38 were
    mandatory. [213-214]

INDICTMENTS found and returned in the Superior Court De-
partment on October 20, 1981.

The cases were tried before *Rudolph F. Pierce,* J.

*Carlo A. Obligato,* Committee for Public Counsel Services, for the defendant.

*Karen J. Kepler,* Assistant District Attorney, for the Commonwealth.

LIACOS, J.   The defendant, Randall W. Trapp, was indicted on October 20, 1981, for the murder of Lawrence (Larry) E. Norton, armed robbery of Norton's landlord, Donald L. Hutcheson, and larceny of Hutcheson's automobile. A jury found Trapp guilty of murder in the first degree, for which he was sentenced to life imprisonment, as required by G. L. c. 265, § 2 (1984 ed.), and armed robbery and larceny of a motor vehicle, for which he was sentenced to concurrent terms of fifteen to twenty years and five to ten years respectively. Trapp appealed his convictions and filed motions for a required finding of not guilty and for a new trial. The trial judge denied the motions. The defendant also has appealed from the denial of his motion for a new trial.[1]

There was evidence of the following facts. Norton paid rent to Hutcheson for two rooms in Hutcheson's house and for the use of common areas of the house. During the early morning of May 8, 1981, Hutcheson was awakened by noises from Norton's bedroom. Moments later, a man burst into Hutcheson's bedroom carrying a knife. Hutcheson testified: "He said to me: Get out of bed. I want your money and your car keys. And you're coming with me." As Hutcheson got out of bed, the man said, "You better have some money. Larry's upstairs dead." Hutcheson handed over $20 and the keys to his automobile. The two men left the house and walked to Hutcheson's automobile, parked on the street nearby. Though he knew that the automobile was unlocked, Hutcheson told the defendant that the defendant would have to unlock the door, since he had the keys. As the defendant switched the knife from his right hand to his left, Hutcheson seized the opportunity to

---

[1] The defendant does not press before this court his appeal of the denial of his motion for a required finding of not guilty, and the denial of the motion for a new trial presents no additional issues.

escape and ran to a neighbor's house. The defendant chased him, but Hutcheson reached the neighbor's door, with the defendant fifty yards behind, and began pounding on the door. When the neighbor's light came on, the defendant turned and fled. Gaining entry to his neighbor's house, Hutcheson called the police.

The police officers responded, entered Hutcheson's house, and found Norton lying nude on the floor of his room, in a pool of blood, dead. Norton had been stabbed eighteen times. The police officers transmitted a description of the stolen vehicle over the police radio. The abandoned vehicle was located later that morning in Somerville. Three witnesses — Hutcheson, a bartender who had seen Norton with another man the evening of May 7, and a service station attendant who had seen Hutcheson's vehicle and had spoken to its driver at 3 A.M. on May 8 — were able to select Trapp's photograph from an array shown them by police officers. A State police fingerprint expert identified a fingerprint found on the gearshift lever of Hutcheson's abandoned automobile as that of Trapp. A warrant was issued, and Trapp was arrested on May 26, 1981.

At his trial, Trapp raised a defense of insanity. He did not testify on his own behalf. Several witnesses testified about his deprived childhood and his troubled adolescence. They also testified about the abrupt and drastic behavioral changes Trapp exhibited in the twelve to eighteen months preceding the crimes. Four experts expressed opinions supporting the defense theory that the violent eruptive episode the night of May 7-8 was the result of a combination of organic abnormality in the part of the brain responsible for impulse control and memory, and of psychological stress brought on by his wife's deviant behavior.[2] The defendant's evidence was that the organic ab-

---

[2] The defendant's wife had worked as a prostitute from the time she was thirteen years old, and she also worked as a stripteaser for six years. She was openly and promiscuously bisexual. Trapp had an aversion to homosexuality, and there was continual friction about her way of life, particularly as it affected their four year old daughter. Both Trapp and his wife had been heavy drug and alcohol users, but the defendant generally had not been a heavy user since their marriage in 1977.

normality which underlay the defendant's behavioral changes was caused by traumatic head injuries he suffered between 1978 and 1981.

On appeal, Trapp contends that (1) the judge committed reversible error and denied him a fair trial by permitting the prosecutor to introduce evidence of his character in the form of other bad acts; (2) the judge violated his right against self-incrimination under the Fifth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution by ordering that he furnish to the prosecutor scientific and medical records and reports containing privileged communications that were used against him at trial; (3) the judge committed reversible error by permitting the prosecutor to communicate to the jury that Trapp previously had been incarcerated; and (4) he was prejudiced by the substitution of judges during jury deliberation in violation of Mass. R. Crim. P. 38, 378 Mass. 916 (1979). He further argues that this court should exercise its power under G. L. c. 278, § 33E (1984 ed.), to grant a new trial or to direct the entry of a verdict of a lesser degree of guilt because of the judge's improper limitation of the testimony of one of the expert witnesses called by the defendant, and for a variety of other reasons.

We agree that the verdict must be overturned because of the admission of improper character evidence. Although we need not address the defendant's other contentions, *Brennan* v. *Bongiorno,* 304 Mass. 476, 478 (1939), we discuss briefly three of his allegations of error, namely the evidence of prior incarceration, the order to produce scientific and medical records, and the limitation of expert testimony, because these issues may arise at a new trial. We also comment, in the interest of the orderly administration of justice, on the substitution of judges.

1. *Admission of evidence of "bad acts."* The judge permitted the prosecutor to introduce evidence that, four years before the murder of Larry Norton, Randall Trapp had told a psychiatrist that he was angry with his wife and that he longed to kill her and her boy friend. The judge also admitted as business records three Officer's Disciplinary Reports describing inci-

dents involving Trapp while he was detained at the Billerica
house of correction awaiting trial. According to one of the
reports, three weeks before the trial the defendant and another
inmate engaged in a verbal altercation, each threatening to kill
the other. Another report indicated that eight months before
trial, Trapp was found to be in possession of a small amount
of marihuana. The third report showed that fifteen months
before trial (three weeks after his arrest) Trapp was involved
in a fight with two other inmates.

It is a fundamental rule that the prosecution may not introduce
evidence that a defendant previously has misbehaved, indicta-
bly or not, for the purpose of showing his bad character or
propensity to commit the crime charged. *Commonwealth* v.
*Welcome,* 348 Mass. 68, 70 (1964). *Commonwealth* v. *Stone,*
321 Mass. 471, 473 (1947). In *Commonwealth* v. *Jackson,*
132 Mass. 16, 20-21 (1882), we stated the rationale of this
long-standing rule as follows: "Such evidence compels the
defendant to meet charges of which the indictment gives him
no information, confuses him in his defence, raises a variety
of issues, and thus diverts the attention of the jury from the
[crime] immediately before it; and, by showing the defendant
to have been a knave on other occasions, creates a prejudice
which may cause injustice to be done him."

While this rule has its exceptions, see P.J. Liacos, Massachu-
setts Evidence 421-422 (5th ed. 1981 & Supp. 1985) (cases
collected), the exceptions to the rule are not without limitation.
See, e.g., *Commonwealth* v. *Brown,* 389 Mass. 382, 384-386
(1983); *Commonwealth* v. *Welcome, supra.*[3] One of the excep-
tions to the rule of exclusion allows admission of evidence of
other bad acts when that evidence relates to a subsidiary issue,
such as the state of mind of the defendant, and is not offered
to prove his guilt but rather to prove a relevant subsidiary fact.
See Proposed Mass. R. Evid. 404 (b) (1981). See also *Common-
wealth*    v.    *Bradshaw,*    385    Mass.    244,    268-270

---

[3] It is also true that evidence of facts admissible for one purpose is not
made inadmissible because it could not be admitted for another purpose.
*Whipple* v. *Rich,* 180 Mass. 477, 479 (1902).

(1982). The Commonwealth argues that the evidence of Trapp's acts in 1977 and in pretrial detainment are within the exception to the rule because the evidence was probative of his sanity. Trapp would have been unable to make threats or to engage in altercations, the Commonwealth contends, if he truly were suffering from the mental disease or defect that he claimed. Logic, experience, and common sense do not support this inference. Despite its claim to the contrary, the prosecution has not established through testimony of expert witnesses that such inferences are warranted. Furthermore, the threats made in 1977, even if they tended to establish his sanity in 1977, would not tend to refute the defendant's claim of lack of mental responsibility in 1981. The defendant's evidence was that his drastic behavioral changes symptomatic of his mental disease or defect first occurred between 1978 and 1981, following traumatic head injuries.

Similarly, at least one of the incidents revealed in the disciplinary reports lacks any rational link to the question of the defendant's mental responsibility on the date of the crime. The probative value of the evidence of possession of marihuana is not clear and was not established. This evidence should not have been admitted, in that it is marginally relevant, at best, and its probative worth is outweighed by the risk of undue prejudice. See Proposed Mass. R. Evid. 403 (1981).

Additionally, a more complex issue is raised by the use of three disciplinary reports to prove three of these incidents. Assuming, without deciding, that evidence that the defendant made a threat to kill another inmate and was engaged in a prison altercation while incarcerated in the Billerica house of correction pending trial was relevant to the issue of his mental responsibility, the Officer's Disciplinary Reports are hearsay.[4]

---

[4] The use of hearsay evidence in a criminal prosecution raises an additional issue of the defendant's constitutional right to be confronted with adverse witnesses. See *Commonwealth* v. *Canon,* 373 Mass. 494, 507-513 (1977) (Liacos, J., dissenting), cert. denied, 435 U.S. 933 (1978). We do not address this issue today, but we note that its potential presence should encourage a judge to exercise care in deciding the admissibility of hearsay evidence.

These records were admitted as business records under G. L. c. 233, § 78 (1984 ed.).[5] Before business records can be admitted under § 78, the judge must make four preliminary findings: (1) that the entry was made in good faith, (2) in the regular course of business, (3) before the beginning of the proceeding, and (4) that it was the usual course of business to make the entry at the time of the event or within a reasonable time thereafter. See *Household Fuel Corp.* v. *Hamacher,* 331 Mass. 653, 655 (1954). The records offered here were made while

---

[5] When we declined to adopt the Proposed Massachusetts Rules of Evidence, we encouraged the bar to cite those rules for our consideration when applicable. Under Proposed Mass. R. Evid. 803 (6) (1981), and under Fed. R. Evid. 803 (6), business records are admissible if made (1) at or near the time of the event, (2) by a person with knowledge of the event, (3) in the course of a regularly conducted business activity in which it was the practice to make such records. The Proposed Rule departs from Massachusetts practice in several respects. Opinions would be admissible. Compare *Julian* v. *Randazzo,* 380 Mass. 391, 393 (1980) (opinions not admissible as part of a business record). The jury would not reconsider the questions of fact that are the basis for admissibility of the records. Compare G. L. c. 233, § 78 (1984 ed.): "[I]n a criminal proceeding all questions of fact which must be determined by the court as the basis for the admissibility of the evidence involved shall be submitted to the jury, if a jury trial is had for its final determination." Cf. *Commonwealth* v. *Harris,* 371 Mass. 462, 469-473 (1976) (Massachusetts "humane practice" described); *Commonwealth* v. *Devlin,* 335 Mass. 555, 563 (1957) (no reversible error where failure to submit questions to jury is without objection). The court would not need to determine that the record was made in good faith "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Proposed Mass. R. Evid. 803 (6) (1981). Records made post litem motam would not be excluded under rule 803 (6).

We conclude today that the extra assurance of unbiased assertions guaranteed by the requirement that a record must have been made before a proceeding began is a necessary component of the Massachusetts business records exception to the rule forbidding the admission of hearsay evidence.

Last, we note that each of the records admitted showed the defendant "guilty" of jail infractions. Whether such disciplinary reports ought to be viewed as merely business records in light of the "aura of officialdom inherent in the report[s] and apparent on [their] face," *Kelly* v. *O'Neil,* 1 Mass. App. Ct. 313, 317 (1973) (police reports), or treated with greater skepticism in a criminal case, we leave to another day. Cf. *Commonwealth* v. *Sellon,* 380 Mass. 220, 230 (1980) (police log of telephone calls properly admitted); *Commonwealth* v. *Walker,* 379 Mass. 297, 302 (1979) (stolen car report; no error where statements contained were not offered for their truth).

the defendant was in custody awaiting trial. The defendant argues that, although the judge made no preliminary findings of admissibility, it is clear that the reports were not made before the beginning of the proceeding and should not have been admitted. Cf. *Commonwealth* v. *Baker,* 368 Mass. 58, 84 (1975) (ruling of admissibility imports the necessary preliminary findings). We agree.

The common law exceptions to the rule excluding hearsay evidence depend on the presence of two elements; (1) a necessity for evidence that otherwise would be excluded, and (2) a guarantee of trustworthiness in the circumstances surrounding the making of the hearsay declaration. P J. Liacos, Massachusetts Evidence 266 (5th ed. 1981). In providing a statutory exception for business records, the Legislature omitted any requirement that the declarant be unavailable, basing the exception entirely on indicia of reliability and trustworthiness embodied in the four qualifying restrictions. See *Wingate* v. *Emery Air Freight Corp.,* 385 Mass. 402, 406 (1982); *id.* at 408 (Liacos, J., concurring). Assuming, without deciding, that the records in this case would satisfy the other three requirements, we do not agree that they were made "before the beginning of the . . . criminal proceeding." G. L. c. 233, § 78. To reach this conclusion, we need not decide precisely when a criminal proceeding begins for all purposes, nor even when it begins for purposes of the business records exception. We need only consider whether, in this case, the criminal proceeding against Trapp could be said to have begun before the records were made.

For this purpose, it is helpful to compare the statutory requirement that the record must have been made before the beginning of the proceeding to the common law prerequisite that hearsay declarations of this type, to be admissible, must have been made ante litem motam, i.e., before the litigation began. The common law rule has been applied even though the litigation had not actually begun at the time the hearsay declaration was made. Bias "is sufficiently probable if a dispute or controversy is actually in progress, even though it may not have reached the stage of legal proceedings." 5 J. Wigmore, Evidence § 1483, at 375 (Chadbourn rev. 1974). See

*DiMarzo* v. *American Mut. Ins. Co.,* 389 Mass. 85, 105-106 (1983); *Simon* v. *Solomon,* 385 Mass. 91, 106-107 n.10 (1982).

A criminal proceeding begins at least as early as indictment. *Commonwealth* v. *McCarthy,* 348 Mass. 7, 11 (1964) (indicted defendant entitled to assistance of counsel), citing *Massiah* v. *United States,* 377 U.S. 201, 204 (1964). A probable cause hearing is also a "critical stage" in the criminal process. *Commonwealth* v. *Britt,* 362 Mass. 325, 330-331 (1972), citing *Coleman* v. *Alabama,* 399 U.S. 1, 9-10 (1970) (right to assistance of counsel at preliminary hearing on probable cause).[6] For some purposes, commencement of proceedings may be said to begin when a suspect is taken into custody. See *Miranda* v. *Arizona,* 384 U.S. 436, 444 (1966); *Commonwealth* v. *Accaputo,* 380 Mass. 435, 452 (1980). But cf. *Commonwealth* v. *Smallwood,* 379 Mass. 878, 884 (1980) (defendant not entitled to assistance of counsel although complaint and arrest warrant had issued and noncustodial interrogation was conducted over telephone; "adversary proceedings" had not yet commenced).

When the Commonwealth has custody and control of the accused, we cannot say that the dispute or controversy between the accused and the Commonwealth has not already begun, for the purposes of admitting hearsay declarations made ante litem motam. So, under G. L. c. 233, § 78, the Officer's Disciplinary Reports made after the defendant was in pretrial detainment at Billerica house of correction are not admissible as business records. There can be no question, on this record, that the use of these records was prejudicial to the defendant. Considered cumulatively, the evidence of threats in 1977 and of misconduct between arrest and trial were so prejudicial that the admission of such evidence requires reversal of the judgments and a new trial.

---

[6] For purposes of assistance of counsel, adversary proceedings do not necessarily commence at the issuance of a complaint and arrest warrant. *Commonwealth* v. *Simmonds,* 386 Mass. 234, 237-238 (1982). *Commonwealth* v. *Smallwood,* 379 Mass. 878, 884 (1980). Cf. *Kirby* v. *Illinois,* 406 U.S. 682, 689-690 (1972) (formal prosecutorial proceedings such as formal charge, preliminary hearing, indictment, or arraignment are necessary before right to assistance of counsel at a lineup attaches).

2. *Additional issues.* We consider some of the issues that may arise again on retrial.

a. *Evidence of prior incarceration.* During cross-examination the prosecutor asked questions clearly indicating that the defendant had been in jail on occasions prior to his arrest for these crimes.[7] Cross-examination is not limited to a narrow range of inquiry, *Hathaway* v. *Crocker,* 7 Met. 262, 266 (1843), but the introduction of prejudicial material is not permitted, see *Commonwealth* v. *Spare,* 353 Mass. 263, 267 (1967). The Commonwealth argues that the questions were offered to impeach the reliability of the psychiatrist's diagnosis by demonstrating that the persons whom the psychiatrist interviewed could not have observed the defendant's behavior during the crucial period. An effort should have been made to achieve this result without the introduction of prejudicial material.[8]

b. *Refusal to admit testimony on defendant's criminal responsibility.* Dr. Herbert Rothfarb, a clinical psychologist, testified about his psychological evaluation of the defendant. He stated that Trapp did not suffer from a psychosis. Based on this

---

[7] The cross-examination of psychiatrist Dr. Frank Ervin included this exchange:

THE PROSECUTOR: "So, these people told you that starting in the Spring of '79 they noticed some changes?"

THE WITNESS: "Correct."

THE PROSECUTOR: "Now, were you aware, Doctor Ervin, that in the Spring of 1979 the defendant was in jail?"

DEFENSE COUNSEL: "Judge, objection."

THE JUDGE: "Objection overruled."

THE WITNESS: "I think that is irrelevant. I mean, it has nothing to do with the precise state of —"

THE PROSECUTOR: "Well, if I tell you, sir, that from the Spring of '79, specifically, in April 1979, the defendant was sent to Billerica House of Correction for a period of a year —"

DEFENSE COUNSEL: "Judge, objection your Honor."

THE JUDGE: "Overruled."

[8] We note the defendant's claim that this evidence was misleading in that the defendant was on furlough at the relevant times. No evidence to substantiate this claim was offered, however. We leave it to the judge's discretion whether such questions should be "sanitized," cf. *Commonwealth* v. *Blaney,* 387 Mass. 628, 638 (1982), or excluded at the retrial.

statement, the judge refused to permit Dr. Rothfarb to give his opinion on Trapp's criminal responsibility. The test for criminal responsibility was set forth in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). The test includes no prerequisite that an expert testify that the accused is psychotic before that expert may offer an opinion on criminal responsibility so long as the testimony relates to a mental disease or defect.[9]

c. *Compelled self-incrimination.* The judge ordered the defendant to furnish to the prosecutor psychiatric and medical reports and records. The defendant argues that this order was a violation of his rights against self-incrimination under the Fifth Amendment to the Constitution of the United States and art. 12 of the Declaration of Rights of the Massachusetts Constitution.

There is no merit to the defendant's arguments. First, it is clear that the initial order of the judge was for the defendant to provide to the Commonwealth the results of those scientific tests which were not testimonial in nature, such as a CAT scan and psychological tests. This order was in the judge's power under Mass. R. Crim. P. 14 (a) (3) and (b) (2) (B), 378 Mass. 874 (1979). Nontestimonial scientific tests are not within the protection of the Fifth Amendment or of art. 12. See *Commonwealth* v. *Brennan*, 386 Mass. 772, 776-783 (1982); *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 759 (1977). Second, the judge properly ordered the defendant to turn over to the Commonwealth the reports of the defendant's experts based, in part, on the defendant's statements only after it became clear that the defendant's experts would testify extensively on such basis. Thus, whatever right the defendant could assert on constitutional grounds was waived. See *Blaisdell, supra* at 766.[10]

---

[9] It appears, however, that the judge may have excluded further questions of Dr. Rothfarb because they were improper in form, in that they called for opinions based not on reasonable medical certainty but rather related to possibilities. Evidence of medical opinion based on possibilities would, of course, be inadmissible. See *Nass* v. *Duxbury*, 327 Mass. 396, 401 (1951).

[10] Nor does the record reveal any violation of a statutory privilege under G. L. c. 233, § 20B (1984 ed. & Supp. Oct. 1985), or § 23B (1984 ed.). Ad-

3. *Substitution of judges*. We touch on one other matter for the reason that it is of grave concern to the proper administration of justice. During jury deliberations, the trial judge was absent on the return of the jury for questions and for delivery of the verdict. He was replaced by two other judges of the Superior Court. The first substitute judge took questions from the jury; the second substitute judge took the verdict. The defendant now claims that the substitution of a judge prior to the receipt of a verdict was in violation of Mass. R. Crim. P. 38 (a) and prejudiced his rights.[11]

Other jurisdictions have addressed situations similar to the circumstances of this case. In an early Illinois case, the substitute judge heard closing arguments and delivered the instructions, prepared in part by the trial judge. The defendant objected to the substitution, and on appeal it was held to be error requiring reversal. *Durden* v. *People,* 192 Ill. 493 (1901). The power of judges was held not to include the right to delegate a duty which involved the exercise of judgment and the application of legal knowledge and judicial deliberation to facts known to the first judge and not known to the second. *Id.* at 498-499.

ditionally, the judge made the requisite finding of § 20B (*c*) that "the interests of justice" required that the defendant's communication be disclosed in this case where the defendant had introduced his mental condition as an element of his defense to the charges against him.

[11] The taking of the verdict by the second substitute judge is authorized by rule 38 (b). Rule 38 provides: "(a) During Trial. If by reason of death, sickness, or other disability the judge before whom a jury trial has commenced is unable to proceed with the trial, any other judge of that court or properly assigned to that court, upon certifying in writing that he has familiarized himself with the record of the trial, may proceed with and finish the trial.

"(b) Receipt of Verdict. Any judge of a court or any judge properly assigned to that court may receive a verdict of the jury.

"(c) After Verdict or Finding of Guilt. If by reason of absence, unavailability, death, sickness, or other disability the judge before whom the defendant has been tried is unable to perform the duties to be performed by the judge after a verdict or finding of guilt, any other judge of that court or properly assigned to that court may perform those duties; but if the other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may, in his discretion or upon motion of the defendant, order a new trial."

The Commonwealth does not claim that the judge was absent for any of the reasons specified in rule 38 (a).

In a case almost on all fours with this one, a trial judge in Washington instructed the jury and then left the courthouse. The jury requested further instruction during deliberation, and, over the defendant's objections, a substitute judge instructed the jury. On appeal, the court found this to be error, entitling the defendant to a new trial. *State* v. *Gossett,* 11 Wash. App. 864 (1974). Other courts have found that error, if any, was harmless, when the jury were not misled or the original instructions were adequate. *United States* v. *Lane,* 708 F.2d 1394 (9th Cir. 1983). *People* v. *Moon,* 107 Ill. App. 3d 568 (1982).

We need not decide whether such a substitution is reversible error because the defendant did not object to the substitution of judges at the time, nor did he claim dissatisfaction with the answers given to the jury by the first substitute judge. We note, however, that Mass. R. Crim. P. 38 (a) is intended to govern cases in which a judge is unable to complete a trial. The circumstances in which a substitute will be permitted are limited to "death, sickness, or other disability." There is no indication in the record that the trial judge was absent for one of those reasons. The rule requires written certification by the substitute judge that he is familiar with the record of the trial. There is no such certification in the record.

We recently addressed noncompliance with Rule 6 of the Superior Court (1974). *Commonwealth* v. *Brown,* 395 Mass. 604 (1985). We concluded that the requirements of rule 6 were mandatory. *Id.* at 606. The requirements of rule 38 which specify that, except for ministerial acts, e.g., taking a verdict under rule 38 (b), the original trial judge should ordinarily be available throughout the trial, ensure the integrity of the trial process. Such aspects of the rules of criminal procedure are entitled to no less respect than the Rules of the Superior Court.

The judgments are reversed, the verdicts set aside, and the cases are remanded for a new trial.

*So ordered.*