COMMONWEALTH *vs.* KENNETH G. SEGUIN.

Middlesex. September 11, 1995. - November 7, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Practice, Criminal,* Voir dire, Examination of jurors, Sequestration of jury. *Insanity. Jury and Jurors. Malice.*

At a murder trial, the judge's individual questioning of each prospective juror was sufficient to ensure that no juror was biased against the defendant's reliance on the defense of insanity. [245-248]

The court announced that, in all future cases in which the defendant indicates that lack of criminal responsibility may be placed in issue and so requests, the judge shall inquire individually of each potential juror, in some manner, whether the juror has any opinion that would prevent the juror from returning a verdict of not guilty by reason of insanity if the Commonwealth should fail to carry its burden of proving the defendant criminally responsible. [248-249]

No ground for reversal of three convictions of murder in the second degree was demonstrated by the trial judge's excusing one juror for cause and not excusing another; by the jury's not having been sequestered from the beginning of the trial; or from the judge's unchallenged instructions concerning malice and motive. [249-250]

INDICTMENTS found and returned in the Superior Court Department on June 9, 1992.

The cases were tried before *Robert A. Barton*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Michael J. Traft* (*J. W. Carney, Jr.*, with him) for the defendant.

*Marguerite T. Grant*, Assistant District Attorney, for the Commonwealth.

WILKINS, J. The defendant appeals from his convictions of murder in the second degree of his wife Mary Ann, his daughter Amy, and his son Daniel. There was evidence that

Mary Ann died from a blow inflicted by an axe while she was sleeping in bed at the family home in Holliston. The jury could reasonably infer that the defendant killed his wife and deposited her body in the Sudbury River where it was found on the morning of April 29, 1992. There was also evidence that, before he killed his wife, the defendant had drugged his children, cut his son's throat, cut his daughter's throat and wrists, and placed their bodies in a pond in Franklin. The police, advised by two fishermen, found the defendant on April 29 near a pond in woods in Hopkinton. He had self-inflicted lacerations to his left wrist, left ankle, left temple, and the right side of his neck. On May 2, reacting to anonymous calls, the police searched the area of the pond and found the children's bodies.

Psychiatric evidence presented by the defendant supported his contention that he lacked criminal responsibility for the killings. We need not recite in detail evidence of the defendant's mental condition and the circumstances, recited by the defendant to his expert witnesses, on which the expert opinions were in part based. Among other things, the defendant told psychiatrists that the only solution to his problems was to take his family to a better and safer place, heaven.

Expert testimony for the Commonwealth was that on April 28 and 29, 1992, the defendant was able to appreciate the wrongfulness of his actions and could conform his behavior to the requirements of law. There was also expert testimony that conduct of the defendant before, during, and after the killings indicated that he had the capacity to control his conduct and to appreciate the wrongfulness of his conduct.

From the beginning of the trial, it was apparent that a major issue for the jury was whether the defendant lacked criminal responsibility. Defense counsel moved for extensive questioning of jurors on various aspects of their backgrounds and specifically as to their opinions of the insanity defense.[1] He

---

[1] We shall use the phrase "insanity defense" as a shorthand way of referring to the lack of criminal responsibility. The burden is on the Commonwealth to prove that a defendant was criminally responsible, and thus the use of the word "defense" is not strictly accurate.

pointed to the extensive publicity that the deaths had received and that the trial would generate, and cited various sources to the effect that many people reject the insanity defense as a matter of principle. The trial judge declined to make such an extensive inquiry but, after describing the crimes in general terms, he advised the jury venire collectively that the defendant intended to rely on an insanity defense and asked if any member had any reason why he or she would not be indifferent. The judge subsequently inquired of each prospective juror individually about his or her attitude with respect to a defense of insanity.

We shall first discuss the defendant's claim that the judge did not go far enough in conducting the voir dire of prospective jurors concerning their attitudes toward a defense of insanity. We shall conclude that the judge's careful questioning of prospective jurors adequately produced a jury unbiased against reliance on an insanity defense in this case. We shall subsequently consider and reject the defendant's arguments that the judge erred in excusing one juror for cause and in not excusing another; that the judge should have sequestered the jury from the beginning of the trial; and that the judge's instruction on motive in relation to malice, although not objected to, was error and requires a new trial.

1. The judge's individual questioning of each prospective juror was sufficient to ensure that no juror was biased against the defendant's reliance on the defense of insanity. In his remarks to the entire venire, the judge reported that the defendant "intends to present evidence that at the time of the killings he was mentally ill and is not criminally responsible for his actions." He asked if any prospective juror had "any reason why [he or she did] not stand indifferent on this case?" One juror came forward at this point to state that he had a problem with the use of an insanity defense. The judge excused him.

When each juror was questioned individually, the judge asked substantially the following question:

"The Commonwealth has the burden of proving beyond a reasonable doubt that this defendant was both guilty of the alleged crime and was criminally responsible; that is, legally sane. If the Commonwealth fails in its burden to prove he was legally sane, have you any opinions that would prevent you from returning a verdict of not guilty by reason of insanity?"

If any prospective juror had difficulty understanding the question or if a prospective juror hesitated in answering, the judge rightly pursued the subject. See *Commonwealth* v. *Auguste*, 414 Mass. 51, 57-58 (1992). All but one of the jurors who were seated answered the question in the negative without any apparent hesitancy or confusion as far as the transcript reveals.[2] The process was successful in disclosing prospective jurors who opposed the use of an insanity defense,[3] and some who had concluded that the defendant was insane.[4] The judge excused everyone in each group.

---

[2]When one person, who was later seated, hesitated before answering the question in the negative, the following ensued:

THE JUDGE: "All right. You seemed to hesitate for a moment."

THE JUROR: "We're all insane a little bit. Committing murder."

THE JUDGE: "Well, I guess what I'm trying to ask you, sir, do you have any problem with the issue of insanity?"

THE JUROR: "If it's proven, no. No."

THE JUDGE: "So if the Commonwealth fails to prove beyond a reasonable doubt that this defendant was sane, have you any opinions that would prevent you from returning a verdict of not guilty by reason of insanity?"

THE JUROR: "No."

[3]Ten prospective jurors rejected the concept of insanity as a defense. Typical responses were: (1) "I would have a hard time being objective with an insanity plea." (2) "I do not believe in that verdict." (3) "I just think if there's a crime committed someone should pay for what they've committed." (4) "I have a problem with guilty or not guilty due to reason of insanity."

[4]Five prospective jurors, in one form or another, said that the defendant had to be insane to do what he did ("Well, as far as I'm concerned he's definitely insane to do something like that to his wife and kids." "I mean he has to be insane to be able to do that." "I think anyone who does that would have to be insane." "Well, I think he's probably insane." "[T]here has to be something wrong with them [*sic*] to do a thing like that").

Opinions of this court have consistently rejected the argument that G. L. c. 234, § 28 (1994 ed.), requires questioning of potential jurors concerning bias against the use of the defense of insanity. See, e.g., *Commonwealth* v. *Prendergast*, 385 Mass. 625, 627-629 (1982); *Commonwealth* v. *Estremera*, 383 Mass. 382, 388 (1981); *Commonwealth* v. *Shelley*, 381 Mass. 340, 353 (1980); *Commonwealth* v. *Killelea*, 370 Mass. 638, 649-650 (1976); *Commonwealth* v. *Ricard*, 355 Mass. 509, 511 & n.3 (1969). The court's position in these cases, summarized in the *Estremera* opinion, has been that it is unwilling "to assume today, any more than we have been in the past, that there is such a widespread prejudice against psychiatrists and the concept of criminal irresponsibility as to mandate inquiry on those subjects." *Commonwealth* v. *Estremera, supra.*

If it appears that a juror might act in whole or in part on issues extraneous to the case, the judge must conduct individual voir dire. See G. L. c. 234, § 28; Mass. R. Crim. P. 20 (b) (2), 378 Mass. 889 (1979). A judge has considerable discretion as to whether the circumstances present a substantial risk that an extraneous influence might affect jurors. See *Commonwealth* v. *Duddie Ford, Inc.*, 409 Mass. 387, 392 (1991); *Commonwealth* v. *Kendrick*, 404 Mass. 298, 303 (1989). We have also required that the defendant show that there is a substantial risk that jurors would be influenced by such considerations. *Commonwealth* v. *Prendergast, supra* at 628-629.

The judge did what our cases have required, even assuming that there was some showing of a threat of extraneous influence. He carefully questioned each prospective juror as to the juror's view of the use of the insanity defense in this case. The results of that questioning are instructive because some potential jurors identified themselves as opposed to the use of that defense, and some potential jurors stated that the defendant must have been insane to do what he did. Neither class of potential juror should have been seated, and neither was. We have no basis for concluding that further inquiry concerning the defense of insanity would have prompted a

change of mind by any juror who unhesitatingly had stated a willingness to return a verdict of not guilty by reason of insanity if the Commonwealth failed to meet its burden of proof.

The jurors' answers to the judge's questions concerning the insanity defense demonstrate the wisdom of making such an inquiry in a case in which the defendant may assert a lack of criminal responsibility. It appears that a considerable proportion of randomly selected people reject or are at least skeptical of the concept inherent in the insanity defense.[5]

We have identified several situations that inherently call for individualized questioning of potential jurors, if the defendant so requests. See *Commonwealth v. Flebotte*, 417 Mass. 348, 355-356 (1994) (on request, in any case involving

---

[5]This court's refusal in various opinions to assume that the public's perception of the insanity defense required individual inquiry of prospective jurors preceded the June, 1982, jury verdict of not guilty by reason of insanity in the trial of President Reagan's would-be assassin, John W. Hinckley, Jr. That verdict received considerable critical publicity and prompted calls for changes in the law. Slovenko, The Insanity Defense in the Wake of the Hinckley Trial, 14 Rutgers L.J. 373, 373 (1983).

Studies indicate also that many people are skeptical of the defense; that psychiatric evidence is not viewed with confidence; that some view the defense as a loophole; and that many perceive that the defense is raised and, when raised, is successful, far more often than is the case. Silver, Demythologizing Inaccurate Perceptions of the Insanity Defense, 18 Law & Hum. Behav. 63, 64, 67-68 (1994); Hans, An Analysis of Public Attitudes Toward the Insanity Defense, 24 Criminology 393, 396, 400 (1986).

Other courts have recognized the problem. See, e.g., *United States v. Jones*, 722 F.2d 528, 530 (9th Cir. 1983) (it is commonly known that public harbors strong feelings about insanity defense); *People v. Cloutier*, 156 Ill. 2d 483, 496 (1993), cert. denied, 510 U.S. 1200 (1994) ("We have recognized that laymen may view an insanity defense with some suspicion. It is for that reason that a prospective juror's views on the insanity defense are an appropriate area of inquiry on *voir dire*." [Citation omitted.]); *State v. Moore*, 122 N.J. 420, 453-454 (1991) ("it is well established that many laypersons have a great deal of difficulty in understanding the insanity defense, and many people might not be able to consider it as a viable defense, particularly to such a heinous act as the killing of a wife and child"); *Matter of the Commitment of Edward S.*, 118 N.J. 118, 139 (1990) ("Anyone moderately familiar with criminal trials and the public's reaction where juries acquit on murder charges by reason of defendant's insanity knows the strength of these concerns and the vulnerability of the justice system to extreme erosion of confidence").

sexual offenses against minor, individual voir dire required as to whether juror had been victim of childhood sexual offense); *Commonwealth* v. *Young*, 401 Mass. 390, 398 (1987), overruled in part on another ground in *Commonwealth* v. *Ramirez*, 407 Mass. 553, 555 (1990) (on request, individual voir dire required in case of interracial murder); *Commonwealth* v. *Hobbs*, 385 Mass. 863, 873 (1982) (on request, individual voir dire required in case involving interracial sexual offenses against children); *Commonwealth* v. *Sanders*, 383 Mass. 637, 640-641 (1981), overruled in part on another ground in *Commonwealth* v. *Ramirez*, *supra* (on request, individual voir dire required in case of interracial rape). In these cases, we announced a prospective rule pursuant to our general superintendence authority and consistent with the policy underlying G. L. c. 234, § 28.

In all future cases in which the defendant indicates that his or her lack of criminal responsibility may be placed in issue and so requests, the judge shall inquire individually of each potential juror, in some manner, whether the juror has any opinion that would prevent him or her from returning a verdict of not guilty by reason of insanity, if the Commonwealth fails in its burden to prove the defendant criminally responsible. It will be in the judge's discretion whether to ask more detailed questions concerning a juror's views of the defense of insanity.[6]

2. The defendant's other challenges present no ground for reversal of his convictions.

(a) The defendant's objection to the judge's denial of his motion to sequester the jury lacks merit. The decision lies in the judge's discretion, and, without proof that jurors were exposed to extraneous information, a defendant's claim must fail. See *Commonwealth* v. *Cordle*, 412 Mass. 172, 179-180 (1992).

---

[6]It may be desirable for the judge to give the entire venire a brief description of the charges and related facts, as happened here (in a form agreed to by the parties). Such a practice might help identify persons who tend to view as insane anyone who did what the defendant is charged with doing, as well as those who oppose the use of the defense of insanity.

(b) A potential juror's statement that she would start with the premise that there was something mentally wrong with the defendant fully supported the judge's excusing her for cause, after extensive questioning. See *Commonwealth* v. *Dickerson*, 372 Mass. 783, 794-795 (1977).

(c) The judge's refusal to dismiss for cause a potential juror who said that she would believe a police officer over a civilian witness presents no ground for reversal in the special circumstances of this case. Although the defendant peremptorily challenged the juror (and ultimately exhausted all his peremptory challenges), the judge gave the defendant an additional peremptory challenge, specifically noting that he did not want the case to "rise or fall on the defendant having to exercise the peremptory challenge to the daughter" of a former State trooper. Accordingly, we need not decide whether the potential juror's inclination to believe a police officer over a civilian witness, solely because of that difference, would require that the person be excused. In *Commonwealth* v. *Vann Long*, 419 Mass. 798, 804 n.6 (1995), we indicated that such a juror response, without further inquiry establishing indifference, requires that the potential juror be dismissed.[7]

(d) We see no substantial risk of a miscarriage of justice arising from the judge's unchallenged instructions concerning malice and motive. A finding of malice is not foreclosed if a defendant, who was criminally responsible, acted on an irrational motive.

*Judgments affirmed.*

---

[7]Partiality for police testimony has been held elsewhere to require that a potential juror be excused for cause, absent further inquiry establishing impartiality. See, e.g., *United States* v. *Amerson*, 938 F.2d 116, 118 (8th Cir. 1991); *State* v. *Draper*, 675 S.W.2d 863, 865 (Mo. 1984); *Commonwealth* v. *Ingber*, 516 Pa. 2, 8 (1987).