COMMONWEALTH vs. DENTON A. ASHMAN.

Suffolk. December 8, 1999. - February 9, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, IRELAND, & COWIN, JJ.

*Practice, Criminal,* Voir dire, Examination of jurors, Capital case. *Jury and Jurors. Insanity. Mental Impairment. Evidence,* Prior misconduct, State of mind, Intent, Hearsay, Cumulative evidence, Relevancy and materiality.

This court declined to expand the holding of *Commonwealth* v. *Seguin,* 421 Mass. 243, 249 (1995), cert. denied, 516 U.S. 1180 (1996), which mandates individual voir dire with regard to juror impartiality in cases in which lack of criminal responsibility is raised as a defense, to encompass cases in which evidence of mental illness or mental impairment is presented. [739-740]

At the trial of a murder indictment, the judge properly exercised her discretion in questioning the venire as a whole and then individuals who responded to questions about possible bias regarding evidence of mental illness or mental impairment, and there was no basis in the record for finding a substantial risk of extraneous influence on the jury such as would have warranted individual voir dire. [740]

No substantial likelihood of a miscarriage of justice arose at a murder trial from the admission of evidence regarding a prior altercation between the defendant and the victim that was admissible to show the defendant's state of mind, intent, and relationship with the victim [740-742]; or from the admission of certain inadmissible hearsay evidence that was merely cumulative of other properly admitted evidence regarding the defendant's relationship with the victim and his state of mind [742-743].

At a murder trial, the judge properly within her discretion admitted in evidence two knives found in a search of the defendant's apartment four days after the victim died, at least one of which matched the description of the murder weapon, which was never found. [743-744]

INDICTMENT found and returned in the Superior Court Department on October 28, 1996.

The case was tried before *Margot Botsford,* J.

*Kevin J. Mahoney* for the defendant.

*Jane A. Sullivan,* Assistant District Attorney (*David E. Meier,* Assistant District Attorney, with her) for the Commonwealth.

COWIN, J. The defendant, Denton A. Ashman, was convicted of murder in the first degree, based on both deliberate pre-

meditation and extreme atrocity or cruelty. We affirm the conviction and decline to exercise our power under G. L. c. 278, § 33E, to reduce the murder verdict to second degree or to order a new trial.

The jury could have found the following facts. The body of Christine Henry was discovered on the evening of October 13, 1996, lying in a pool of blood on the sidewalk of Norwell Street in the Dorchester section of Boston. The cause of death was multiple stab wounds from a single knife with a flat edge and at least an eight-inch blade. The victim also had two defensive slash wounds, as if she "were trying to fend off a knife."

The victim was last seen leaving her home for work at approximately 6:40 P.M. on October 13. At about 4 or 5 P.M. that day, she had received a telephone call, and talked on the telephone for one and one-half hours. During that call, the victim handed the telephone to her sister, Patricia Williams, but she refused to take the telephone. During that conversation, Williams heard the victim repeat three times: "It's over."

The day before the stabbing, the defendant told an acquaintance that the victim had left him, that he had been depressed since she left and that "he just felt that, like the only way they can be together would be like he would kill her, then kill himself." Later, the defendant left a message for this same acquaintance saying, "he did what he said he was going to do and he just called to tell me bye and he'd see me in the afterlife." On the evening of the murder and the following day, the defendant telephoned a coworker of the victim, the victim's sister, and a friend of the victim, admitting to each of them that he had killed the victim. In one conversation he said that he "loved her to death." In two of the calls he indicated that he had killed the victim because neither she nor her sister would talk with him on the telephone.

The defendant was arrested on the day following the murder. He told the booking officer that he was suffering from mental illness. In a statement to the police, the defendant denied any connection to the victim's death, said that he had not made the incriminating telephone calls, and provided an exculpatory account of his activities on the day of the murder. He also stated that he had tried unsuccessfully to hang himself after he had learned about the victim's death. The officers had no difficulty understanding the defendant and noticed nothing unusual about

his appearance or demeanor. He "seemed emotional," but was not crying and was cooperative.

At trial, and in contrast to his statement to the police, the defendant did not contest that he had killed the victim, but maintained that he was suffering from "diminished capacity or mental impairment," and that his severe depression caused him to kill the victim. He sought to obtain a verdict of murder in the second degree. To this end, Dr. Marc Whaley, a psychiatrist, testified that he had interviewed the defendant and concluded that when the defendant killed the victim, he suffered from "major depression without psychosis." The doctor detected no psychotic symptoms and stated that defendant's depression "did not substantially impair . . . his ability to appreciate the wrongfulness of his conduct [or] his mental functioning in terms of his ability to control himself according to the requirements of the law [but] . . . there was impairment in his mental functioning at the time of the incident that impaired his ability to weigh the pros and cons of carrying out his aggressive wishes towards this unfortunate victim." Dr. Whaley opined that the defendant's "aggressive act was a direct result of his severe depression at the time." The defendant had not been taking his antidepressant medication at the time of the stabbing.[1]

The defendant also adduced evidence that he spoke with his brother-in-law, Antonio Green, on October 13, and said that he had killed and stabbed the victim, thought she was dead, and was going to kill himself. Green thought the defendant sounded as if he were "not really in his right state of mind." The defendant spoke to his brother the next day and sounded depressed and frustrated.

1. *Voir dire.* The defendant claims that the trial judge erred by failing to question members of the venire individually regarding their ability fairly and impartially to consider evidence of mental illness or mental impairment. He argues that such individual questioning is required by *Commonwealth* v. *Seguin*, 421 Mass. 243, 249 (1995), cert. denied, 516 U.S. 1180 (1996).

In her remarks to the entire venire, the judge explained that evidence might be introduced "concerning the defendant's mental condition and, specifically, about mental illness . . . and

---

[1]Approximately one month before the killing, the defendant had been voluntarily admitted to Bournewood Hospital where he remained for about five days. As a result of this hospitalization, antidepressants had been prescribed.

its impact on his ability to commit the crime of murder." She asked if any prospective juror had "any opinions about mental illness or about evidence concerning mental illness on the part of a defendant that you think might interfere with your ability to listen to the evidence and to be a fair and an impartial juror, deciding the case based only on the evidence and the instructions of law that I will give to you."

The jurors who responded affirmatively were questioned individually. The judge inquired if the juror could listen to the evidence with an open mind and consider fairly whether the defendant did or did not have the capacity to form the necessary specific intent to commit the crime of murder. If any prospective juror had difficulty understanding the question or hesitated in answering, the judge inquired further. The defendant is not concerned with the impartiality of those jurors who responded to the question to the entire venire; they were questioned individually. The defendant maintains that individual voir dire of those members of the venire who did not respond to the question addressed to the group as a whole was necessary for the judge to ascertain the impartiality of any venireperson who might be reluctant to admit publicly to bias against mental impairment.

If it appears that a juror might act in whole or in part on issues extraneous to the case, the judge must conduct individual voir dire. See G. L. c. 234, § 28; Mass. R. Crim. P. 20 (b) (2), 378 Mass. 889 (1979). A judge has considerable discretion as to whether the circumstances present a substantial risk that an extraneous influence might affect jurors. See *Commonwealth* v. *Seguin, supra* at 247, citing *Commonwealth* v. *Duddie Ford, Inc.,* 409 Mass. 387, 392 (1991); *Commonwealth* v. *Kendrick,* 404 Mass. 298, 303 (1989). The defendant must show that there is some basis for finding that a substantial risk of extraneous influences on the jury exists, *Commonwealth* v. *Boyer,* 400 Mass. 52, 55 (1987), citing *Commonwealth* v. *Campbell,* 378 Mass. 680, 696 (1979), and that there is a substantial risk that jurors would be influenced by such considerations. *Commonwealth* v. *Seguin, supra,* citing *Commonwealth* v. *Prendergast,* 385 Mass. 625, 628-629 (1982).

In *Commonwealth* v. *Seguin, supra* at 249, we decided that "[i]n all future cases in which the defendant indicates that his or her lack of criminal responsibility may be placed in issue and so requests, the judge shall inquire individually of each potential

juror, in some manner, whether the juror has any opinion that would prevent him or her from returning a verdict of not guilty by reason of insanity, if the Commonwealth fails in its burden to prove the defendant criminally responsible."

In this case, there is no question that the defendant sought to obtain a verdict of murder in the second degree. This was made clear to the judge before trial began. We decline to expand the *Seguin* rule to encompass cases in which evidence of mental illness or mental impairment is presented. The *Seguin* rule applies only to cases in which the defendant seeks a verdict of not guilty by reason of insanity. In other cases, it is within the judge's discretion to question the jurors as the judge did here.

The judge followed the requirements of our cases. Her question addressed to the venire and her further individual questioning were sufficient to ensure that no juror was biased against the defendant because of the juror's reliance on the evidence of diminished capacity or mental impairment. She carefully questioned each prospective juror who had affirmatively answered the general question on mental illness about whether that juror could fairly decide if evidence of mental illness affected the defendant's capacity to intend to commit a crime. There was no basis in the record to require the judge to determine that there was a substantial risk of extraneous influences on the jury. Indeed, even defense counsel stated immediately prior to empanelment: "[A]lthough criminal responsibility is not going to be raised as an issue, I think the question your Honor is asking [to the entire venire] covers the issue fairly well, but again, I'm just not sure at this time, Judge, whether or not by doing it in the general venire is the right way to do it."

The trial judge assured that prospective jurors who might have difficulty accepting the impact of evidence of mental impairment on intent were excluded from the jury. The process "adequately produced a jury unbiased against reliance on [mental impairment evidence] in this case." *Commonwealth* v. *Seguin, supra* at 245.

2. *Prior bad acts evidence.* The defendant argues that the judge committed reversible error by admitting evidence of two instances of prior bad acts involving the defendant and the victim. He claims that the prejudicial impact of this evidence outweighed its probative value as there was no issue regarding whether the defendant had killed the victim. Because the

defendant conceded motive and the act of killing the victim, the only issue was whether he was capable of the requisite mental intent or capacity to commit the crime. The evidence in question, the defendant argues, was not probative as to his mental capacity. *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 512-513 (1997) (error in murder case in which critical issue was degree of defendant's culpability to permit witness to testify to victim's statement about prior injuries defendant had inflicted on her). Because the defendant did not object to this evidence at trial,[2] we review to determine whether there was a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).

a. *September incident.* The defendant contends that testimony should not have been admitted regarding an altercation between the defendant and the victim on September 7, 1996 (about one month prior to the murder). Stacey Boothe, an acquaintance of the defendant, testified to the defendant's statement that the victim had "gotten cut with a knife . . . just like she held the blade and she got cut. [F]rom the way he was talking, I [Stacey] assumed he [held the knife] . . . it wasn't intentional . . . by accident she got cut." Dr. Whaley testified during cross-examination to a different version of this incident. The doctor said that the defendant had related that the victim had cut her hand during an argument with him. The defendant said that the victim had reached into a trash can to get a bottle to fight him and had cut herself on some broken glass. The defendant said that he then took her to a hospital. Other witnesses testified that they saw the victim with a bandage on her hand at about this time. The hospital records of the victim relating to the incident were admitted in evidence.

There was sufficient evidence to permit the jury to find that there was a violent relationship between the victim and the defendant. The evidence was admissible to show the defendant's state of mind, intent, and relationship with the victim, all live issues at trial.[3] See *Commonwealth* v. *Leonardi*, 413 Mass. 757, 762-764 (1992) (admitting defendant's prior bad acts against

---

[2]A motion in limine to exclude evidence of the defendant's prior conduct did not preserve the objections now raised on appeal. See *Commonwealth* v. *Niemic*, 427 Mass. 718, 724 (1998); *Commonwealth* v. *Keniston*, 423 Mass. 304, 308 (1996).

[3]The defendant's reliance on *Commonwealth* v. *Trapp*, 396 Mass. 202 (1985), is misplaced. *Trapp* does not hold that, where the defendant's sanity is

girl friend for relevant probative purposes). The judge exercised her discretion in weighing the probative value of this evidence against its prejudicial effect. This evidence did not constitute impermissible "bad act" evidence and was properly admitted.[4]

b. *July incident.* The defendant argues in addition that two of the victim's friends should not have been permitted to testify regarding certain events of July 16, 1996. These witnesses stated that, in response to a telephone call from the victim on that date, they went to the defendant's apartment, spoke with the victim, and that one of the friends then telephoned the police. The witnesses said that, after the police arrived, the victim gathered her clothing and she and her son went to the home of one of the friends. One of the witnesses testified that the defendant arrived at the apartment "at the end [of the incident]." The other witness stated that the defendant arrived "later on, maybe ten minutes after we got there."

Although the Commonwealth introduced no evidence that the defendant had physically abused the victim in connection with this July incident, a possible inference from the evidence regarding the event is that the defendant had abused the victim (or might abuse her) and was a sufficient threat to warrant police intervention to protect her.[5] As such, this evidence was the equivalent of a statement by the witnesses that the victim had told them that the defendant had abused (or was a threat to abuse) her. Yet there was no evidence that the women had witnessed any abuse and no evidence that the defendant admitted any violence toward the victim at this particular time. Thus, this evidence is no more than the equivalent of repeating state-

---

at issue, it is error to admit evidence which fairly shows the existence of a violent relationship between the defendant and the victim. The evidence in the *Trapp* case did not make that showing: the threats were made to someone other than the victim and were too remote in time. *Id.* at 206-207.

[4]The judge also gave the jury a limiting instruction to assure that this evidence was not used for substantive purposes. She told the jury that they could not use the evidence to infer that the defendant had committed murder in the first degree. The judge stated that the "sole purpose for the introduction of that evidence and the only issue that you may consider it on is the limited purpose of the defendant's state of mind, intent and relationship with [the victim] . . . and nothing else."

[5]If the evidence were not offered for such a purpose, it lacked relevance.

ments of the victim. As such, it is clearly inadmissible hearsay. See *Commonwealth* v. *Seabrooks, supra* at 509-513.[6]

Despite the fact that the evidence regarding the July visit to the defendant's apartment should not have been admitted, its admission did not result in a substantial likelihood of a miscarriage of justice. This evidence was cumulative of other substantial properly admitted evidence regarding the defendant's relationship with the victim and his state of mind. *Commonwealth* v. *Wright, supra.*

For example, he told Stacey Boothe the day before the murder that he thought he should kill the victim because she had left him. The day after the murder, the defendant told Sonia Blake that he loved the victim "to death" and that he decided to kill her because she did not want to talk with him. During cross-examination, Dr. Whaley, the defendant's expert, testified the defendant admitted to doctors at Bournewood Hospital that he had shown anger and rage toward the victim in the past, had physically and verbally abused her, and that some of these episodes resulted in severe injury. The defendant himself offered the records detailing those admissions. The defendant also told another psychiatrist on October 3, 1996, that he and the victim often fought, sometimes violently, and that sometimes he had physically assaulted her. This properly admitted evidence allowed the jury to conclude that the relationship between the defendant and the victim was violent and abusive. See, e.g., *Commonwealth* v. *Cormier*, 427 Mass. 446, 449-450 (1998) (defendant's statement that he "should have just blown [the victim] away [earlier] and gotten it over with" was relevant in establishing defendant's possible motive and intent in killing his wife); *Commonwealth* v. *Andrade*, 422 Mass. 236, 239-240 (1996) (defendant's admission to brother that he and victim were having "marital problems" and to others that he intended to kill his wife first and then himself properly admitted as probative of defendant's intent and state of mind).

3. *The knives.* Although the murder weapon was never recovered, a search of the defendant's apartment four days after

---

[6]Cases which the Commonwealth cites do not assist its position. The admission of such evidence in both *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 509-513 (1997), and in *Commonwealth* v. *Cyr*, 425 Mass. 89, 92-95 (1997), was erroneous. In *Commonwealth* v. *Andrade*, 422 Mass. 236, 239-240 (1996), testimony was properly admitted from witnesses who heard loud arguments between the defendant and the victim.

the death of the victim yielded several knives and empty knife sheaths. Two of the knives were admitted in evidence. The defendant contends that this was error. One knife contained within a leather sheath had an eleven and one-half inch blade and was found under the defendant's bed. The second knife was a folding knife seized from the defendant's dresser.[7] The medical examiner testified that the victim was stabbed with a single knife with a flat edge and at least an eight-inch blade. The blade of the murder weapon had a width of at least one-half inch and a tip of at least one-quarter inch.[8] At least one of the knives matched the description of the murder weapon. These weapons were not simply common kitchen knives and they were found in the defendant's bedroom.

Evidence that a defendant possessed a weapon that could have been used to commit a crime is relevant to prove that the defendant had the means of committing the crime. *Commonwealth* v. *James*, 424 Mass. 770, 779 (1997) (knives found at defendants' residences eighteen days after murder were relevant to show defendants had means of committing crime). There need not be proof that the particular instrument was in fact the weapon actually used. *Id.* at 779-780. Whether to admit such evidence is left to the discretion of the trial judge whose decision "will be accepted on review except for palpable error." *Commonwealth* v. *Marangiello*, 410 Mass. 452, 456 (1991), quoting *Commonwealth* v. *Booker*, 386 Mass. 466, 469-470 (1982). The judge was within her discretion in admitting evidence of the two knives.[9]

4. *Relief pursuant to G. L. c. 278, § 33E.* We have considered the entire record pursuant to our obligation under G. L. c. 278, § 33E. There is no reason to exercise our authority to reduce the jury's verdict or to order a new trial. The defendant received a fair trial, and the jury's verdict is consistent with the evidence

---

[7]There was no evidence of the size of this blade.

[8]The medical examiner could not be more specific regarding the size or shape.

[9]The judge limited the admission of this evidence to the issue whether the defendant had the means to commit the murder. She instructed the jury that this evidence was admissible "only on the issue that the defendant may have had the means to commit the offense that is at issue here . . . and [that] there is no evidence that any of these knives was actually used" in connection with the victim's death.

that the defendant acted with malice and a conscious and clear purpose to kill his former girl friend.

*Judgment affirmed.*