NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-08772


COMMONWEALTH  vs.  NICHOLAS R. COLTON.



Middlesex.      December 9, 2016. - May 4, 2017.

Present:  Gants, C.J., Lenk, Hines, & Gaziano, JJ.


Homicide.  Constitutional Law, Admissions and confessions,
     Voluntariness of statement, Sentence.  Evidence, Admissions
     and confessions, Voluntariness of statement, Joint
     enterprise, Prior misconduct, Intoxication.  Joint
     Enterprise.  Intoxication.  Mental Impairment.  Jury and
     Jurors.  Practice, Criminal, Capital case, Motion to
     suppress, Admissions and confessions, Voluntariness of
     statement, Instructions to jury, Jury and jurors,
     Empanelment of jury, Argument by prosecutor, Sentence.




     Indictment found and returned in the Superior Court
Department on September 10, 1998.

     A pretrial motion to suppress evidence was heard by Charles
T. Spurlock, J., and the case was tried before Paul A. Chernoff,
J.


     Michael J. Traft for the defendant.
     Casey E. Silvia, Assistant District Attorney, for the
Commonwealth.


     LENK, J.  In December, 2000, the defendant was convicted of

murder in the first degree on theories of extreme atrocity or

cruelty and deliberate premeditation in the August, 1998, stabbing death of his cousin, Robert McDonald.  At the time of the killing, the defendant was twenty-one years old.  On appeal, the defendant argues that a statement he made to police was not voluntary and should not have been admitted at trial.  He also challenges certain evidentiary rulings, and he argues that there were errors in the jury instructions and that the judge abused his discretion in failing to dismiss several jurors for cause.  In addition, the defendant claims that the prosecutor's closing argument was improper and that his mandatory sentence of life in prison without the possibility of parole violates the United States Constitution and the Massachusetts Declaration of Rights.  Finally, the defendant seeks extraordinary relief pursuant to G. L. c. 278, § 33E.

Having carefully reviewed the entire record, we discern no error warranting reversal, nor any reason to exercise our authority under G. L. c. 278, § 33E, to reduce the verdict or order a new trial.  We therefore affirm the defendant's conviction.

1.  Background.  a.  Facts.  We recite the facts the jury could have found, reserving certain details for later discussion.

i.  <u>Day of the stabbing</u>.  The victim and the defendant had grown up together and had continued their friendship as adults.[1] On the evening of August 15, 1998, the defendant and his friends Mark Heymann and Kenneth Scott Cronin picked up the victim at his cousin's house in Newton.[2]

The four then drove to a liquor store near Pettee Square in Newton, where the defendant purchased a "30-pack" of Budweiser beer and a two-liter bottle of Bacardi Limon.  They joined a larger group of people who were drinking beer at a nearby park. Although the defendant remained fairly sober, the victim soon became highly intoxicated.  The defendant told several people that he was angry with the victim and that he intended to beat him up.  One of those individuals responded that the defendant "should be a man about it and wait till the next day and . . . settle it one-on-one straight, [and] not do it while . . . everybody's drunk."  The defendant responded that he probably would follow that advice.

---

[1] Approximately three years earlier, the defendant and the victim had gotten into a dispute because the defendant suspected that the victim was involved with the defendant's girl friend, but thereafter they seemed to have returned to their former "good" friendship.

[2] The victim was working in New Hampshire for the summer but was in Newton visiting his cousin, Donna D'Angelo, for the weekend.  Her husband, Richard D'Angelo, who was also the defendant's uncle, went outside to greet the defendant and his friends as they pulled up.  At that point, the defendant appeared to be sober.

Later in the evening, the group of people at the park began to disperse. At some point, Cronin left. Around 10:30 P.M., the defendant, the victim, and Heymann left in Heymann's vehicle, a blue Oldsmobile Cutlass. The group arrived at around 11 P.M. at the defendant's mother's house in Newton, where the defendant was then living and where he kept a collection of knives.[3] The three men thereafter headed to Minute Man National Historical Park in Lincoln, approximately thirteen miles away. At some point during the drive, Heymann pulled the vehicle over into a parking lot. The defendant then attacked the victim with a knife. Defensive wounds on the victim's hands and wrists demonstrate that he attempted to fend off the attack. Bloodstains on the tops of his feet and in the area surrounding the vehicle suggest that he got out of the vehicle during the attack. Ultimately, the victim was stabbed eighty-six times, both inside and outside the vehicle, including at least once after he died. The victim's body was then dragged across a hiking trail in the park and left in the woods.

ii. The investigation. The next day, August 16, 1998, two hikers walking on the trail found the body approximately twenty-five feet from the trail, and contacted a park ranger, who

---

[3] The defendant's next door neighbor saw Heymann's motor vehicle pull up in front of her house and heard someone get out and begin vomiting in the street. She attempted to call 911 but in the time it took her to disconnect the Internet from her telephone line, the vehicle pulled away.

notified police.  Police made casts of tire tracks at the scene and of footprints found near the victim.  The following day, shortly after a conversation with the victim's father, State police Troopers Owen Boyle and David Burke went to the home of the defendant's uncle, Richard D'Angelo, and, after one-half hour of conversation with him, went to the defendant's mother's house.  They found Heymann sitting in the driver's seat of his vehicle, parked in the driveway.  One of the officers walked over and spoke with Heymann, who remained in his vehicle.

When the defendant walked out of the house, Boyle asked him about the victim's whereabouts shortly before his death.  The defendant said that he had last seen the victim on the night of August 15, 1998, when he and two other friends had picked up the victim on their way to Pettee Square to drink beer with a group of friends.  He said that, at some point, Heymann had driven the victim to the Eliot Street Massachusetts Bay Transportation Authority (MBTA) station so that the victim could go to Chelsea to purchase "crack" cocaine from someone named "EJ."[4]  When the trooper told the defendant that the victim had been found dead in Lincoln, the defendant became "upset" and "emotional."  He took off his sunglasses, threw them to the ground, and sat down on the front steps, "cradl[ing] his head in his hands" for some

---

[4] Police later identified EJ and learned that he had been incarcerated at that time.

time.  When Boyle asked for more information, the defendant stated that he was done talking to him and would not respond to any additional questions.  At that point, Boyle went to speak with Heymann, whose account of the evening was essentially the same as the defendant's.  The defendant and Heymann also gave their friend Cronin a similar account when he asked what had taken place after the defendant, Heymann, and the victim left the party.

Investigators also spoke with others who had been at the party.  One partygoer, Matthew Bosselman, said that, earlier on the day of the killing, he had seen the defendant take an aluminum bat from Heymann's vehicle and hide it by the railway tracks near Pettee Square.  Bosselman reported that the defendant had said he was angry with the victim and intended to beat him up.  Police later discovered an aluminum baseball bat in a shack near the railroad tracks, which Bosselman identified at trial.

Police then went to Heymann's house to examine the tires on his vehicle.  When they arrived, they found the vehicle in the driveway with a number of cleaning products on its roof.  The vehicle was impounded for analysis.  There were numerous bloodstains on the back seat; all of the blood matched that of the victim.  There was a fingerprint smeared in the victim's blood near the switch on the interior dome light.  The

fingerprint belonged to Heymann.  The tire treads on the vehicle matched tire imprints found near the hiking trail where the victim had been dragged.

Soon thereafter, police learned that the defendant and a man fitting Heymann's description had gone to a junkyard to purchase parts from the interior of a vehicle similar to Heymann's Oldsmobile Cutlass.  They were unable to purchase the parts, and were asked to leave because the vehicle they had been examining, without permission, was in a restricted area of the yard.  After learning of the visit to the junkyard, police decided to speak to the defendant.  In an effort to locate him, they spoke with D'Angelo, who arranged for the defendant to go to Pettee Square, where Boyle and two other officers were waiting.  The defendant agreed to go to the Newton police station for questioning, and was brought there in a police cruiser.  D'Angelo followed in his own vehicle.  The officers took the defendant to an interview room.  Boyle observed that he appeared to be steady on his feet, did not smell of alcohol, and did not appear to be intoxicated.

Boyle read the defendant the Miranda rights from a preprinted card.  The defendant signed the card indicating that he understood each of the rights and agreed to waive his rights and speak to police.  He repeated the account that he had given two days earlier, stating that he had last seen the victim

walking to the Eliot Street MBTA station on his way to purchase crack cocaine. Boyle then said that he "had some information that led [him] to believe that [the defendant] was not telling . . . the truth about what had happened" that night. He told the defendant that he had reason to believe the defendant had been in the area of Pettee Square with a baseball bat earlier that day, and that the victim had been with the defendant and Heymann later than they had suggested. Boyle also said that the tire treads on Heymann's vehicle matched those found near the location where the victim's body had been discovered. At that point, the defendant asked if he could speak with Boyle alone.

After the other officers left the room, the defendant asked Boyle if he needed a lawyer. Boyle responded that he could not decide for the defendant but added that, if the defendant thought it would be helpful, he could consult with his uncle D'Angelo, who was downstairs. The defendant assented. Boyle brought D'Angelo to the interview room and left the two alone. The substance of the conversation that followed is disputed, but it appears that, at some point, the Federal death penalty was discussed. After about ten minutes, D'Angelo opened the door and told Boyle that the defendant wanted to cooperate with police. D'Angelo commented that the defendant was concerned

about the possibility of the Federal death penalty;[5] Boyle told the defendant that, as this was a State matter, the death penalty could not be imposed.

The defendant then provided a different account of events on the night of the victim's death.[6] The defendant said that he, Heymann, and the victim had driven around for a while after leaving Pettee Square, with no particular destination in mind. At some point, Heymann pulled over and left the vehicle to relieve himself. While Heymann was away from the vehicle, the defendant said that the victim attacked him with a knife, and that he killed the victim in self-defense. He said that Heymann had no involvement in the killing, but did not remember whether he had assisted in moving the body. He remembered that he and Heymann had disposed of their bloody clothing in a Dumpster near Newton South High School, and he had thrown the knife in the Charles River. When Boyle asked the defendant why he had been seen in the area of Pettee Square with a baseball bat earlier that day, the defendant responded, "I don't know, maybe I was trying to be a tough guy, I don't know."

The defendant then agreed to have his statement audio recorded. His recorded statement was similar in most respects,

---

[5] Minute Man National Historical Park, where the victim's body was found, is Federally owned land.

[6] D'Angelo sat next to the defendant throughout both the unrecorded and the recorded statements.

with a few exceptions.  The defendant said that he could not recall the baseball bat and that he had been very drunk and had "kind of blacked out" after the victim pulled a knife on him.  The defendant also noted that he had drunk two alcoholic beverages before speaking with police, and that he had taken a Klonopin pill at approximately the same time.  At that point, Boyle asked the defendant whether he understood what Boyle was saying and whether he was comfortable speaking with Boyle.  The defendant responded affirmatively.  At the conclusion of the interview, the defendant was arrested.  He then led officers to the bridge where he had disposed of the knife.  The following morning, a State police dive team retrieved a knife in a sheath from the water beneath the bridge.  The knife contained no fingerprints.[7]  Police also recovered two knives from the defendant's mother's house.

b.  Trial proceedings.  The defendant filed a motion in limine to suppress his statement at the police station, arguing that it had not been voluntary because of his unstable mental condition and the coercive presence of his uncle, D'Angelo. After an evidentiary hearing at which Boyle, D'Angelo, another police officer, and a defense expert testified, a Superior Court judge denied the motion.  The judge found that the defendant's

---

[7] The officer who conducted the fingerprint testing on the knife testified at trial that the knife's submersion in water could have dissolved any fingerprints on it.

"Miranda waiver was voluntary and that his statement[] to law enforcement officials and to others [was] voluntary beyond a reasonable doubt."  The defendant sought reconsideration, proffering testimony by a psychiatrist with new information on his mental impairment.  After an evidentiary hearing, a different motion judge denied that motion.[8]

At trial, the defendant did not dispute that he had stabbed the victim.  Rather, the theory of the defense was that the defendant had lacked the substantial capacity to conform his behavior to the requirements of the law, and thus was not criminally responsible for the killing.  The defense also argued that, at the time of the stabbing, the defendant had lacked the capacity for premeditation.  Two expert witnesses testified that the defendant suffered from "intermittent explosive disorder," temporal lobe epilepsy, and a number of other mental conditions that prevented him from conforming his behavior to the law.  The prosecution presented its own expert, who testified that the defendant suffered from antisocial personality disorder, and that he was criminally responsible for the killing.  The jury convicted the defendant of murder in the first degree on

---

[8] In his decision, the judge stated that, after listening to the audio recording of the interview, he determined that the defendant sounded lucid, "alert and coherent."  He also noted that the "record is absent of any evidence of coercive behavior of D'Angelo towards the defendant."

theories of extreme atrocity or cruelty and deliberate premeditation.

2. Discussion. On appeal,[9] the defendant argues that (1) his motion to suppress should have been allowed; (2) the judge improperly permitted the jury to consider the theory of joint venture; (3) the judge erred in allowing admission of the baseball bat found near Pettee Square and two knives found in the defendant's mother's house; (4) the jury instructions on the relationship between voluntary consumption of alcohol and other intoxicants and criminal responsibility were erroneous; (5) four jurors should have been struck for cause; (6) portions of the prosecutor's closing argument were improper; (7) the mandatory sentence of life without parole violates the defendant's right against cruel and unusual punishment under the United States Constitution and the Massachusetts Declaration of Rights; and (8) this court should exercise its authority to grant relief pursuant to G. L. c. 278, § 33E.

a. Motion to suppress. The defendant argues that the statement he made to police after speaking with his uncle D'Angelo, in which the defendant admitted that he killed the victim, should have been suppressed. He contends that the

---

[9] The record does not make clear why the defendant's direct appeal has taken sixteen years to reach this court. As we have noted previously, "a delay of this length can pose significant difficulties." Commonwealth v. Celester, 473 Mass. 553, 560 n.8 (2016).

statement was not voluntarily made, as his will was overborne due to his limited emotional and intellectual capacity, along with coercion by his uncle.  In "reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error, 'but conduct an independent review of [the judge's] ultimate findings and conclusions of law'" (citation omitted).  Commonwealth v. Libby, 472 Mass. 37, 40 (2015).

It is axiomatic "that a confession or an admission is admissible in evidence only if it is made voluntarily." Commonwealth v. Tremblay, 460 Mass. 199, 206 (2011).  A statement is voluntary when it is "the product of a 'rational intellect' and a 'free will,' and not induced by physical or psychological coercion" (citation omitted).  Id. at 207.  The appropriate inquiry concerns whether, "in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." Commonwealth v. Selby, 420 Mass. 656, 663 (1995).  Factors that may be considered in assessing whether a defendant's will was overborne include, inter alia, "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability . . . and the details of the interrogation."  Commonwealth v. Mandile, 397 Mass. 410, 413 (1986).  The Commonwealth bears the burden of establishing

"beyond a reasonable doubt that the defendant's confession was voluntary." Commonwealth v. Monroe, 472 Mass. 461, 468 (2015).

In this case, we discern no reason to disturb the findings of the two motion judges who denied the defendant's motion to suppress and denied reconsideration of that motion. The defendant's assertion that he was emotionally and intellectually incapable of voluntarily making his statement to police is not supported by the evidence. Both judges determined, after listening to the audio recording of the defendant's interview with police, that he appeared to understand his circumstances and that he sounded lucid and coherent. Nothing in the audio recording of the defendant's interview suggests otherwise.[10] During the interview, Boyle twice asked the defendant if he was comfortable with the proceedings and could understand the questions he was being asked. Both times, the defendant answered affirmatively. He then provided an exculpatory explanation of the killing, "indicating an awareness of the consequences of waiving his rights and speaking to the police." Commonwealth v. Beland, 436 Mass. 273, 281 (2002).

The defendant's contention that his uncle D'Angelo coerced him into making the statement is similarly unavailing. To

---

[10] Where a judge bases a legal conclusion on facts found in a recording, we are in the same position as the judge in reviewing that recording, and take an independent view of its significance, without deference. See Commonwealth v. Clarke, 461 Mass. 336, 341 (2012), and cases cited.

begin, the defendant relies on a line of cases involving a statutory right provided to juveniles to consult with an interested adult before waiving their Miranda rights.  See, e.g., Commonwealth v. Smith, 471 Mass. 161, 162 (2015).  We have concluded that, in some circumstances, the presence of a so-called "interested adult" may be psychologically coercive to the extent that it affects the voluntariness of a juvenile's statement.  See Commonwealth v. Adams, 416 Mass. 55, 61 (1993).  It was undisputed that, for much of his life, the defendant's uncle D'Angelo had served as a father figure.  The concerns regarding any coercive pressure from an interested adult, however, are inapplicable to the defendant, who was twenty-one years old at the time of his statement.

In addition, the record does not support the defendant's contention that D'Angelo coerced him such that his statement to police was involuntary.  The defendant's argument in this regard is based on his own affidavit, in which he said that D'Angelo had pressured him to cooperate with police and tell them everything he knew, and told him that he could face a Federal death penalty if he did not.  He stated in the affidavit that D'Angelo had repeated the threat of the death penalty many times while they were alone in the interview room, and also that D'Angelo, who was sitting next to the defendant, "continually prodded" him during the interview, and told the defendant that

he "needed to keep speaking and provide all the information [that he] had about" the case.  The transcript of the interview does not reflect any statement by D'Angelo.[11]

Moreover, the defendant's account is inconsistent with D'Angelo's testimony at the first suppression hearing.  D'Angelo testified that he did not coerce the defendant and, to the contrary, suggested that the defendant might want a lawyer.  The first motion judge deemed D'Angelo's testimony credible.  See Tremblay, 460 Mass. at 205 ("[q]uestions of credibility" are left to "motion judge who had the opportunity to observe the witnesses").  In addition, both Boyle and D'Angelo testified at the first evidentiary hearing that D'Angelo asked them about the potential of the Federal death penalty in the presence of the defendant, and that Boyle replied that it was not a possibility in this case.  The defendant did not dispute the account, where any potentially coercive impact of the specter of the death penalty had been ameliorated before the defendant made his statement.  Furthermore, when the defendant made his statement to police, he showed no signs of intoxication, and answered the officers' questions readily, while responding affirmatively when asked whether he understood what he was saying.

---

[11] The quality of the audio recording, however, does not allow us to discern the nature of various ambient background noises during the interview.

In sum, we cannot conclude that the two motion judges, who each conducted evidentiary hearings, and considered, separately, the conduct of the defendant's interview with police and the defendant's acknowledged mental conditions, abused their discretion in denying the defendant's motion to suppress and his request for reconsideration of that motion.

b. <u>Instruction on joint venture</u>. The defendant contends that, given the insufficiency of the evidence as to a joint venture between himself and Heymann,[12] the trial judge erred in instructing the jury on joint venture. As there was no objection to the instruction, we review for a substantial likelihood of a miscarriage of justice. <u>Commonwealth</u> v. <u>Randolph</u>, 438 Mass. 290, 294 (2002). Because the evidence supported the judge's instruction, we discern no error.

An instruction "is proper if it is supported by any hypothesis of the evidence." <u>Commonwealth</u> v. <u>Silanskas</u>, 433 Mass. 678, 689 (2001). To establish a joint venture, the Commonwealth must prove beyond a reasonable doubt that the defendant "knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense." <u>Commonwealth</u> v. <u>Zanetti</u>, 454 Mass. 449, 466 (2009).

---

[12] Heymann was charged separately from the defendant, and was not a codefendant in this trial. He eventually pleaded guilty to manslaughter and received a sentence of not less than nineteen nor more than twenty years of imprisonment.

Here, there was ample evidence to support the instruction on joint venture.

Heymann drove the defendant and the victim, in his own vehicle, thirteen miles to a secluded wooded area. Even assuming that, as the defendant claimed, Heymann was not involved in the stabbing, he was present at the scene as the defendant stabbed the victim repeatedly; Heymann's fingerprint, with the victim's blood on it, was on the vehicle's dome light. After the victim was left by the two in the woods, Heymann drove the defendant home. According to the defendant's own statement, Heymann assisted in disposing of the bloody clothes and the knife that had been used in the stabbing. In the days that followed, Heymann and the defendant provided the same, false account of what had taken place that night, including to one of their joint acquaintances, Cronin. In addition, Heymann made several efforts to conceal evidence of the crime, by attempting to clean the blood from the interior of his vehicle, and by going with the defendant to obtain replacement parts for those that had been covered in the victim's blood. Given this evidence, and the reasonable hypothesis that could be drawn from it, the judge's instruction on joint venture was appropriate. See Silanskas, 433 Mass. at 689.

c. Prior bad act evidence. The defendant claims error in the admission of a baseball bat and two sheathed knives.

Bosselman testified that he had seen the defendant conceal a baseball bat on the day of the victim's death, and the knives in question were found by police in the defendant's mother's house, where the defendant was living at the time. The defendant argues that these objects were highly prejudicial evidence of his prior bad acts.

It is axiomatic that "[e]vidence of prior misconduct is not generally admissible to prove bad character or a propensity to commit crimes." Commonwealth v. Libran, 405 Mass. 634, 640 (1989). Such evidence is admissible only if relevant for some other purpose, such as to establish "knowledge, intent, motive, [or] method, material to proof of the crime charged." Commonwealth v. Imbruglia, 377 Mass. 682, 695 (1979), quoting Commonwealth v. Murphy, 282 Mass. 593, 598 (1933). The "prosecution [is] entitled to present as full a picture as possible of the events surrounding the incident itself," Commonwealth v. Robidoux, 450 Mass. 144, 158 (2007), as long as the probative value of the evidence is not "outweighed by the risk of unfair prejudice to the defendant." Commonwealth v. Crayton, 470 Mass. 228, 249 (2014). The weighing of these factors is left to the "sound discretion of the judge, whose decision to admit such evidence will be upheld absent clear error." Commonwealth v. Oberle, 476 Mass. 539, 550 (2017), quoting Robidoux, supra.

We discern no error in the admission of the baseball bat, which was introduced not as evidence of the defendant's bad character, but to establish the defendant's state of mind and his intent to harm the victim. Based on the location where the bat was found,[13] Bosselman's testimony that the defendant had concealed it, along with testimony from a number of witnesses concerning the defendant's anger and his stated intent to "beat" the victim, the jury could have inferred that the defendant had a plan to harm the victim on the night of his death. That the defendant ultimately stabbed the victim rather than hitting him with the bat does not diminish its relevance in this regard.

Moreover, the jury could have inferred from the act of hiding the baseball bat that the defendant did not, as his expert witnesses testified, simply "snap" and assault the victim but, rather, had planned in advance to harm him. See Commonwealth v. Philbrook, 475 Mass. 20, 27-28 (2016). The probative value of the baseball bat to the Commonwealth's case outweighed any potential prejudice to the defendant. See id. Without the admission of the baseball bat and its corroboration of Bosselman's testimony, "the killing could have appeared to the jury as an essentially inexplicable act of violence." See Commonwealth v. Bradshaw, 385 Mass. 244, 269 (1982).

---

[13] The police found the bat hidden near train tracks close to where the gathering had taken place in Pettee Square.

The knives recovered from the defendant's mother's house were admissible as weapons potentially used to stab the victim. Although the defendant told police that the knife found in the Charles River was the weapon used in the stabbing, it contained no fingerprints, and thus was not necessarily the murder weapon. The Commonwealth's medical examiner testified at trial that, due to the "variable" nature of the wounds, the precise length and width of the blade used to kill the victim could not be determined.[14] There was also evidence that the defendant returned home after the killing and thereby had an opportunity to store the murder weapon there. Accordingly, the knives properly were admitted not as bad act propensity evidence, but were properly admitted as the means by which the defendant may have stabbed the victim. See Commonwealth v. Ashman, 430 Mass. 736, 743-744 (2000) ("Evidence that a defendant possessed a weapon that could have been used to commit a crime is relevant to prove that the defendant had the means of committing the crime"); Commonwealth v. James, 424 Mass. 770, 779-780 (1997) (knives found at defendants' residences relevant to show they had means of committing murders, even without direct proof that those particular knives were used in commission of offense).

---

[14] One of the knives was larger than the other, and both were sheathed.

Moreover, the knives were relevant to the Commonwealth's theory of deliberate premeditation. Cronin testified at trial that he had not seen the defendant carrying a knife at the gathering in Pettee Square. He also testified that the defendant had a collection of knives at his house. The Commonwealth presented evidence at trial, largely through the testimony of the defendant's neighbor, that the defendant returned home briefly after the gathering in Pettee Square and before taking the victim to Minute Man National Historical Park. Based on this evidence, the Commonwealth argued that the defendant had returned to his mother's house to retrieve a knife. The knives were relevant to corroborate Cronin's testimony concerning the existence of the defendant's knife collection and to support the Commonwealth's suggested inference that the defendant returned to his home after the gathering in Pettee Square in order to get a knife he planned to use on the victim.

In sum, there was no abuse of discretion in the decision to allow the admission of the baseball bat and the knives.

d. Instruction on criminal responsibility. The defendant argues that the instruction concerning the relationship between the voluntary consumption of drugs or alcohol and the question of criminal responsibility did not conform to the instructions provided in Commonwealth v. Berry, 457 Mass. 602, 617-618 & n.9

(2010), <u>S</u>.<u>C</u>., 466 Mass. 763 (2014), and revised in <u>Commonwealth</u> v. <u>DiPadova</u>, 460 Mass. 424, 439 (2011) (Appendix), and thereby created a substantial risk of a miscarriage of justice.[15]  In particular, the defendant argues that the judge's instruction in this case was flawed insofar as it could have caused the jury to discount the defendant's mental incapacity defense solely because he had consumed alcohol and drugs on the night of the

---

[15] The judge instructed:

"The issue has been raised that the defendant may not have been criminally responsible for his alleged actions due to use of drugs or alcohol, or at least in part. Voluntary intoxication with drugs or alcohol is not by itself a mental disease or defect that will support a verdict of not guilty by reason of insanity.  The normal consequences of drug and alcohol addiction are not a basis for relieving a defendant of criminal responsibility. However, there may be situations where a defendant who is addicted to drugs or alcohol might have the defense of lack of criminal responsibility available to him.  You may consider whether the defendant had a mental disease or defect apart from his drug or alcohol addiction such that he lacked substantial capacity at the time of his crime to conform his conduct to the requirements of law.  In addition, you may consider whether the defendant's voluntary consumption of drugs or alcohol activated a latent mental disease or defect apart from the addiction itself.  If as a result of the activation of that latent mental disease or defect the defendant lost the substantial capacity to understand the wrongfulness of his conduct or to conform his conduct to the requirements of the law, the defendant would lack criminal responsibility.  However, if the defendant knew or subjectively had reason to know under the circumstances that his use of drugs or alcohol would activate the mental disease or defect, he may not rely on that disease or defect to assert a lack of criminal responsibility."

victim's death, and had some recognition that doing so could impact his behavior.

Although Berry and DiPadova were decided a decade after the defendant's trial, "he is entitled to the benefit of changes in decisional law that are announced after trial and pending his direct review." Commonwealth v. Johnston, 467 Mass. 674, 704 (2014). Because there was no objection to the instruction at trial, we review to determine if the instruction created a substantial likelihood of a miscarriage of justice. Id.

Although the language of the judge's instruction did not precisely match the wording of the model instructions subsequently set out in Berry and DiPadova, there is no merit to the defendant's contention that such a difference was meaningful to the jury's finding. The concern animating our decisions in Berry and DiPadova was that a jury might conclude "erroneously . . . that even if the defendant's mental illness by itself caused him to lack substantial capacity, 'because [he] had consumed [drugs] that contributed to [his] incapacity, that would render the lack of criminal responsibility defense moot.'" DiPadova, 460 Mass. at 436, quoting Berry, 457 Mass. at 418. The instruction given here, however, raises no such cause for concern.

The judge instructed that the jury should "consider whether the defendant had a mental disease or defect apart from his drug

or alcohol addiction such that he lacked substantial capacity at the time of his crime to conform his conduct to the requirements of law."  This language mirrors our model instructions in Berry and DiPadova.  Compare DiPadova, 460 Mass. at 439 ("where a defendant . . . has a mental disease or defect that itself causes him to lack the substantial capacity . . . , he is not criminally responsible for his conduct regardless of whether he uses or does not use alcohol or drugs").  The judge's instruction did not provide any leeway for the jury to find both that the defendant was criminally responsible because of his alcohol and drug consumption and that his mental defect or disease alone caused him to lack substantial capacity to conform his conduct to legal requirements.  We note in this regard that none of the evidence presented at trial suggested that the defendant knew or should have known that the consumption of alcohol or drugs would aggravate his preexisting mental condition.  The evidence before the jury was to the contrary, instead suggesting that the defendant used these substances in an attempt to treat his multiple mental difficulties.[16]

  e.  Jury empanelment.  The defendant contends that the judge erred in not striking four jurors for cause.  One potential juror had impending travel plans, another initially

---

[16] One of the defense experts testified that the defendant used "drugs and alcohol" to "medicate himself."

noted an ambivalence toward a defense of a lack of criminal responsibility, and two had family connections to law enforcement officers.

The first juror said during voir dire on November 28, 2000, that he had airplane tickets for December 14, 2000. The judge empanelled the juror after telling him that the trial likely would conclude by the time of the flight. That forecast proved wrong and, when trial had not concluded by December 14, the deliberating juror was excused and replaced with an alternate. "Although judges must exercise caution in discharging a deliberating juror, . . . the judge has discretion to decide whether a juror is unable to perform his or her functions, . . . and whether good cause, personal to the juror, exists for dismissal" (citations omitted). Commonwealth v. Sanders, 451 Mass. 290, 306 (2008). Although it is doubtless better practice to avoid empanelling jurors with travel plans that are very close to the anticipated end of the trial, see id. at 307 n.16, we cannot say on this record that the judge abused his discretion by empanelling and later discharging the juror due to the juror's impending flight. See id. at 306-307 (judge did not abuse her discretion by discharging juror who had nonrefundable airplane tickets).

The defendant also challenges the judge's decision to empanel the alternate juror. The alternate juror initially

responded during voir dire that he had a "hard time with [the] concept of" the "defense of a lack of criminal responsibility." The judge then explained the operative law further and asked whether the juror "could be fair both to the defendant and the Government in this case." The juror responded, "Yes, I think so." Although trial counsel did not object to the empanelment of the juror on these grounds, the defendant argues on appeal that the juror's response was ambiguous and that the judge should have explored the juror's concerns further before deciding whether to empanel him.

As a general principle, it is an abuse of discretion to empanel a juror who will not state unequivocally that he or she will be impartial. See Commonwealth v. Long, 419 Mass. 798, 804 (1995) (trial judge abused discretion in empanelling juror who could not unequivocally state that he would be impartial); Commonwealth v. Somers, 44 Mass. App. Ct. 920, 921-922 (1998) (same). Because the juror's subsequent response here fairly could be viewed as unequivocal, and the judge apparently credited it as such, we discern no abuse of discretion in the empaneling of the juror. Contrast Long, supra (juror's response to question concerning whether he could be fair to defendant that, "I would really hope that I could be," not unequivocal).

The defendant contends also that the judge erred in empanelling two jurors who had family connections -- uncles, a

brother, and a cousin -- to law enforcement. The judge credited their representations that such connections would not affect their ability to be impartial. That a juror has family members who work in law enforcement does not, without more, mean that the juror is incapable of being impartial. See Commonwealth v. Ascolillo, 405 Mass. 456, 460-461 (1989), and cases cited. Given that the defendant points to no other basis for potential bias, the judge's decision to empanel these jurors was not an abuse of discretion.

f. Prosecutor's closing argument. The defendant contends that the prosecutor's closing argument was improper because she referred to an incident described in the defendant's medical records, which had been introduced by the defendant, to argue that the defendant was criminally responsible for the killing. In her closing, the prosecutor described the defendant's assault of a staff member at a mental health facility where he had resided as a juvenile. She emphasized that the defendant had said after the assault that he would have been sorry if the assault had happened to someone else, but that the particular staff member "deserved it." Such conduct, the prosecutor argued, demonstrated that the defendant was "able and capable of holding a grudge and acting out in revenge," which supported the Commonwealth's theory that the defendant killed the victim in revenge for an earlier dalliance with the defendant's girl

friend rather than due to a mental disease or defect.  The defendant maintains that the remarks impermissibly used evidence from his medical records substantively, and that the account of the incident constituted inadmissible hearsay.  Because there was no objection at trial, we review for a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Johnston, 467 Mass. at 704.

Although medical records are admissible substantively only if they bear certain indicia of reliability, see Commonwealth v. Wall, 469 Mass. 652, 667 (2014), the prosecutor did not use facts in the medical records as substantive evidence in her closing.  Rather, she used details of the incident in the medical record, introduced by the defendant, to refute the opinion offered by the defendant's expert that the incident demonstrated the defendant's lack of criminal responsibility. See Commonwealth v. Dunn, 407 Mass. 798, 809 (1990) (prosecutor's use of defendant's statements to his doctor in refutation of defense witness's opinion did not constitute attempt to turn those statements into substantive evidence). Moreover, any potential prejudice to the defendant was mitigated by a comprehensive limiting instruction, given before the prosecutor's closing, that the jury were to consider any reference to the defendant's statements to a mental health assessor only with respect to the mental health assessor's

evaluation of the defendant's criminal responsibility.  See Commonwealth v. Donahue, 430 Mass. 710, 717-718 (2000) (judge's limiting instruction concerning defendant's statements to psychiatrist cured any potential prejudice).

g.  Constitutionality of sentence.  The defendant argues that, given his mental instability at the time of the offense, sentencing him to life imprisonment without the possibility of parole constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights.  The gravamen of the defendant's argument is that the same principles underlying the United States Supreme Court's decision in Miller v. Alabama, 567 U.S. 460, 470 (2012) ("mandatory life-without-parole sentences for juveniles violate the Eighth Amendment"), and this court's decision in Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 670-674 (2013), S.C., 471 Mass. 12 (2015) (holding that imposing sentence of life imprisonment without possibility of parole on juveniles violates art. 26), suggest that the defendant's sentence was unconstitutional.

The analysis in Miller and Diatchenko was limited to juveniles, and relied on the fact that juveniles, due to their general immaturity, impulsiveness, and impressionable nature, are "constitutionally different from adults for purposes of sentencing."  Miller, 567 U.S. at 471.  Diatchenko, 466 Mass.

at 660, 663. This principle is inapplicable to the defendant, who was twenty-one years old at the time of the offense. We decline the defendant's invitation to extend our holding in Diatchenko in this manner.

h. Relief pursuant to G. L. c. 278, § 33E. Having carefully reviewed the entire record, we discern no reason to exercise our power under G. L. c. 278, § 33E, to set aside the verdict or to reduce the degree of guilt. Notwithstanding the defendant's acknowledged history of troubled behaviors as a child and as a teenager, the weight of the evidence supports the defendant's conviction of murder in the first degree on theories of extreme atrocity or cruelty and deliberate premeditation.

Judgment affirmed.