NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1019

COMMONWEALTH

vs.

KENTON THOMAS.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a jury trial, the defendant was convicted of the lesser included offense of involuntary manslaughter on an indictment that charged him with second-degree murder. The defendant raises four issues on appeal. First, he contends that trial counsel was ineffective for failing to properly redact the transcript of his recorded interview with detectives that was submitted to the jury. Second, he argues that the admission of a folding knife found on his person when he was arrested weeks after the murder was unduly prejudicial because it was not definitively proven that the knife was used to stab the victim. Third, the defendant argues that the judge abused her discretion by limiting cross-examination of a cooperating witness. Lastly,

the defendant argues that he was deprived of a fair trial when the judge ruled that his jury consultant could not be present in the courtroom during jury selection.  We affirm.

Background.  In the early morning hours, the defendant, his friend, and the victim socialized together near Mattapan Square.  The friend used the defendant's cellular telephone to call two drug dealers, planning to buy "crack" cocaine with money that he and the defendant had pooled.  Although the first drug dealer did not have anything to sell, the second drug dealer arrived by car and sold the friend crack cocaine.  The friend and the defendant walked to a nearby church parking lot and smoked the crack cocaine.  The victim did not join them.  After five to ten minutes, the friend returned to a place near where he bought the drugs and met up with the victim.  The defendant subsequently rejoined them.  At trial, the friend testified that the defendant punched the victim in the shoulder twice and said, "Where's my money?"  The defendant knocked the victim to the ground, but the victim got back up.  The defendant and the friend then left the area on foot.  Surveillance video showed the defendant and the friend exiting an alley.  The two figures were identified during the course of the trial but we describe them solely by order of appearance.  The first figure walked out of the alley and down one street, and a second figure jogged out of the alley and down another street.  The video showed the

2

first figure kneeling near a storm drain and tossing an object down the drain.  A knife was later recovered from the bottom of the storm drain.

Less than a minute after the defendant and his friend left the alley, the victim staggered out of the alley and collapsed in the middle of the street.  A passing driver later found the victim lying in a pool of blood with a box cutter next to him. The victim had suffered one stab wound and five incision wounds. The stab wound to his arm cut his brachial artery, which caused significant bleeding.  The victim died due to sharp wound injuries and blood loss.  The medical examiner opined that the kind or kinds of instruments that were used to kill the victim could not be determined.  It was the Commonwealth's theory at trial that the first figure to exit the alley was the defendant, that he dropped a knife down the storm drain, and that the storm drain knife was the weapon he used to stab and kill the victim.

The friend cooperated with investigators.  He provided a physical description of the defendant as well as the drug dealer's phone number.  Investigators obtained the drug dealer's cell phone call records, which revealed a call from a phone number registered to the defendant's mother.  The friend identified the defendant in a photo array as the man who stabbed the victim.

Seven weeks after the crime, detectives brought the defendant in for questioning.  Before the interview, detectives seized a folding knife that the defendant was carrying, which was later admitted in evidence at trial.  During the recorded interview, the defendant made several incriminating statements.  The defendant admitted that he carried an old phone that he let people use to call drug dealers.  He said that "sometimes, you know, you just get tired of being bullied," and "I just get tired of it, but you never intend to hurt anybody."  The defendant went on to tell detectives that "just hypothetically speaking . . . you're thinking, you know, the next time this particular person will know or won't, you know, bother this person, whatever, and then you get word that somebody died.  Your heart jumps out of your fucking chest . . . .  It's over for me."  Although the defendant denied any wrongdoing, he admitted that he was at the crime scene with someone whose name "starts with a P."[1]  He insisted that "nothing was meant to go down" and that "I witnessed something I wasn't supposed to witness."  A redacted version of this interview was admitted in evidence at trial.  The redactions consisted of both court-ordered redactions and redactions agreed-upon by the parties.  The redactions concerned potentially prejudicial information

---

[1] The friend's name starts with the letter "P."

4

such as past arrests, an unrelated warrant, and the potential sentences for murder.  The Commonwealth also introduced a redacted transcript of the interview, and each juror was provided with a paper copy.  During deliberations, the jury also had access to a thumb drive with a PDF version of the redacted interview.

Sometime after trial, the defendant became aware that the PDF transcript on the thumb drive may have been improperly redacted.[2]  The contents of the thumb drive, including the PDF file, are part of the record on appeal.  The defendant argues that if the jurors had plugged the thumb drive into a computer and viewed the PDF, that they could have edited the PDF and read the redacted portions.  The defendant contends that the "redactions" were merely black highlighting, and that by changing the color of the highlights to a transparent color, or by deleting them altogether, the jurors could have read the redacted portions of the interview.

Discussion.  1.  Ineffective assistance of counsel.  The defendant contends that trial counsel was ineffective for allowing the thumb drive with the improperly redacted PDF file

---

[2] The defendant's appellate counsel disclosed at oral argument that he discovered the allegedly improper redactions as he was preparing the record appendix for this appeal.

5

to go into the jury room. In the alternative, he argues that this sequence of events gave rise to a substantial risk of a miscarriage of justice.

In a claim for ineffective assistance of counsel, the defendant has the burden of showing that "(1) 'there has been serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinarily fallible lawyer'; and (2) as a result, the defendant was 'likely deprived . . . of an otherwise available, substantial ground of defence.'" Commonwealth v. Henley, 488 Mass. 95, 134 (2021), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).

A motion for new trial is the "preferred method" for raising an ineffective assistance of counsel claim. Commonwealth v. Davis, 481 Mass. 210, 222 (2019). A claim for ineffective assistance of counsel made solely on the trial record is the "weakest form" of such a claim. Id. Only "when the factual basis of the claim appears indisputably on the trial record" will the defendant be entitled to relief. Id. at 223, quoting Commonwealth v. Gorham, 472 Mass. 112, 116 n.4 (2015).

The defendant's argument fails at the outset because it lacks a factual predicate. The record is devoid of any evidence that the PDF could have been altered by the jurors. Since trial counsel did not move for a new trial, there was no fact finding

6

in the lower court regarding the PDF files. The defendant argues that because the PDF file is part of the record on appeal, this court can draw its own conclusions regarding whether the jurors could have viewed the redactions. This is not the role of an appellate court. See Commonwealth v. Alphas, 430 Mass. 8, 21 (1999) (Greaney, J., concurring) ("Appellate courts do not sit as triers of fact"). We are in no position to assess for ourselves the technological feasibility of editing PDF documents.

Moreover, even if we were to assume that the PDF is capable of manipulation as the defendant asserts, there is no showing that the jurors ever viewed the PDF, let alone tampered with it. The judge instructed the jurors that "you are not to speculate or engage in any guesswork about what the blacked-out portion may contain or any of those portions may contain because they're not before you." If the jurors had tampered with the PDF to read the redactions, they would have directly violated the judge's instruction. We presume that the jury followed the judge's instructions. Commonwealth v. Brown, 479 Mass. 163, 173 (2018). To charge counsel with the obligation to foresee a jury's disobedience would undermine this clearly settled proposition.

The defendant argues that despite the factual deficiency, the mere possibility that the jury could have viewed the

7

redactions is enough to warrant a new trial. We disagree. First, the defendant cites no authority for this proposition. Again, as we have noted, we presume that the jurors properly followed the judge's instruction. Brown, 479 Mass. at 173. Second, in an ineffective assistance of counsel claim, the defendant bears the burden of showing that counsel's errors "likely deprived the defendant of an otherwise available, substantial ground of defence." Saferian, 366 Mass. at 96. See Commonwealth v. Montez, 450 Mass. 736, 755 (2008). In other words, "there ought to be some showing that better work might have accomplished something material for the defense." Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977). See Commonwealth v. Millien, 474 Mass. 417, 430-431 (2016) (articulating this standard in terms of whether the error prejudiced the defendant). The defendant has failed to make this showing. There are no facts in the record that establish that the defendant was prejudiced by counsel's purported errors, since there is no evidence that the jurors ever read the prejudicial material. The defendant's ineffective assistance claim fails as a result.

The defendant's alternative argument -- that the issue gave rise to a substantial risk of a miscarriage of justice -- fails for the same reasons. As explained above, the defendant has not established that the jurors ever viewed the redactions. Without

8

such a showing, there is no proper basis on which we can conclude that there was any error, much less one that materially influenced the outcome.  See Commonwealth v. Horne, 476 Mass. 222, 228 (2017).

2.  Restriction of cross-examination.  The defendant filed a motion in limine to admit evidence that at the time of the crime, the friend had an open case for assault with a deadly weapon involving a knife.  The judge ruled that testimony concerning the following facts were admissible:  that the friend had an open case for assault with a deadly weapon, that it involved a knife, that the case was open when the friend spoke with investigators, and that the Boston police department was involved in both cases.  The judge excluded testimony regarding the facts of the open case and the potential sentences for assault with a deadly weapon.

At trial, the friend testified that he spoke to the police on three separate dates prior to his grand jury testimony.  He testified that the open case was pending during all three interviews.  Defense counsel extensively cross-examined the friend; he inquired into the friend's drug habit, inconsistent testimony, and bias.  To impeach the friend for bias, defense counsel asked if the open case was "in the back of [his] mind" when he spoke with investigators, which the friend denied. Defense counsel culminated this line of cross-examination by

9

asking the friend if the police raised the subject of the open case during their first interview.  The judge sustained the Commonwealth's objection.  The judge explained that the question was "completely unnecessary for probative value, and it's prejudicial to the Commonwealth, and I think the line is drawn there, and it's a fair line."  The defendant claims error in the judge's limitation of cross-examination on the issue of bias.

The Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights give a defendant the right to cross-examine prosecution witnesses on the issue of bias or prejudice.  Commonwealth v. Avalos, 454 Mass. 1, 6-7 (2009).  See Davis v. Alaska, 415 U.S. 308, 316-317 (1974).  This right, however, is not absolute.  Commonwealth v. Barnes, 399 Mass. 385, 393 (1987).  A judge has broad discretion to admit evidence of bias and "may limit and 'control the scope of cross-examination . . . once the jury have been "adequately exposed" to the issue.'"  Commonwealth v. Mountry, 463 Mass. 80, 86 (2012), quoting Commonwealth v. Joyce, 382 Mass. 222, 231 (1981).  What the judge may not do is "bar all inquiry into the subject" of bias.  Avalos, 454 Mass. at 7, quoting Commonwealth v. Allison, 434 Mass. 670, 681 (2001).

The judge acted within her discretion because she did not foreclose inquiry into the issue of bias.  To the contrary, she allowed the defendant to cross-examine the friend about his open

10

case; namely, that the open case was for assault with a deadly weapon, that it was open when he spoke with investigators, and that the Boston Police Department investigated both cases. Once the jury had been "adequately exposed to the issue," Mountry, 463 Mass. at 86 (quotation omitted), the judge stepped in. The judge did not allow inquiry into the facts of the open case, which, as the prosecutor argued at side bar, bordered on propensity evidence.[3] Nor did the judge allow the defendant to ask the friend whether the open case was discussed during his initial interviews with Boston police detectives. The jurors could already infer that the friend had an incentive to testify against the defendant to garner favorable treatment on his open case. The judge was within her discretion to draw a line on the permissible scope of cross-examination. Compare Commonwealth v. Taylor, 455 Mass. 372, 378-381 (2009) (defendant impeached witness for bias by highlighting witness's favorable plea agreement and relationship with a codefendant; judge then limited inquiry into defendant's refusal to testify at codefendant's trial). We cannot conclude that the judge's decision to limit cross-examination was "outside the range of

_____

[3] Although the prosecutor's references to propensity evidence at side bar came after the defendant's question about whether the police raised the subject of the open case, the prosecutor was more likely referring to the facts of the open case as potential propensity evidence.

11

reasonable alternatives," L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), because the witness had already been impeached for bias.

3. Admission of the folding knife. At trial, the defendant objected to the admission of the folding knife that detectives found on him when the defendant was brought in for questioning. We review the judge's evidentiary ruling for abuse of discretion. Commonwealth v. Ashman, 430 Mass. 736, 744 (2000).

Prior to trial, the defendant filed a motion in limine to exclude evidence that the defendant possessed the folding knife when he was arrested seven weeks after the crime. The Commonwealth argued that the folding knife was admissible because it could have been used to commit the crime. The medical examiner testified that the type of knife used to kill the victim could not be determined. The judge deferred her ruling on the question whether the knife was admissible but noted that "we have multiple people and multiple [knives] . . . if we're going to be fair to the jury, to give them the full picture, I don't see why we'd be leaving out this one [knife]." The judge ultimately ruled that the folding knife was admissible only for the limited issue of whether "the Defendant had access to and knowledge of a weapon that could have been used in the commission of the crime charged."

The Supreme Judicial Court's decision in Commonwealth v. Colton, 477 Mass. 1 (2017), is instructive. In that case, the defendant stabbed and killed the victim and threw the knife into the Charles River. Id. at 4, 7. State Police divers retrieved the knife from the riverbed, but having been underwater, the knife was washed clean of fingerprints. Id. at 7 & n.7. Police also recovered several knives from the defendant's personal collection, which were admitted at trial. Id. at 4, 13. The medical examiner testified that the type of knife used to kill the victim could not be determined. Id. at 13. The Commonwealth's theory at trial was that the Charles River knife was the murder weapon, bolstered by the defendant's admission that he threw the murder weapon in the river. Id. at 4, 7, 13. Since the knife had no fingerprints, however, it could not be conclusively proven that it was used to commit the murder. The judge ruled that the knives from the defendant's collection were admissible "as the means by which the defendant might have stabbed the victim." Id. at 13.

Similarly, here, as the Commonwealth asserts, even though it could not be conclusively determined which knife was the murder weapon, the folding knife was properly admitted to show

13

that the defendant had the means to commit the crime.  Ashman,
430 Mass. at 744.[4]

4.  Jury consultant.  The defendant argues that the judge
abused her discretion by denying the defendant's motion for
funds to hire a jury consultant (or expert) to assist in jury
selection.  This argument is unavailing because although the
judge initially denied the defendant's motion for funds, she
subsequently allowed it and, in fact, the defendant had the
benefit of a jury consultant.

Next, the defendant argues that he was deprived of a fair
trial because the jury expert was not permitted to consult with
the defendant in the courtroom.  The defendant was permitted to
consult with his expert outside of the courtroom only.  The
defendant's primary contention is that by excluding the jury
consultant from the courtroom, the judge effectively closed the

---

[4] At oral argument, the defendant argued that the knives in
Colton were admissible merely to prove premeditation.  We do not
read Colton so narrowly.  The court in Colton explained that
"the knives properly were admitted not as bad act propensity
evidence as the means by which the defendant might have stabbed
the victim."  Colton, 477 Mass. at 13.  See Ashman, 430 Mass. at
744 ("Evidence that a defendant possessed a weapon that could
have been used to commit a crime is relevant to prove that the
defendant had the means of committing the crime"); Commonwealth
v. James, 424 Mass. 770, 779-780 (1997) (holding that knives
from defendants' homes admissible to show defendants had means
of committing crimes).  The court was clear that the knives in
Colton were admissible as the possible murder weapons, not only
to prove the defendant's mental state.

courtroom, which amounts to structural error requiring reversal. This argument too falls short.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to a public jury trial. Waller v. Georgia, 467 U.S. 39, 46 (1984); Commonwealth v. Cohen, 456 Mass. 94, 106 (2010). The right to a public trial extends to jury empanelment. Cohen, supra, citing Presley v. Georgia, 558 U.S. 209 (2010). A partial closure of the courtroom may amount to structural error when there is not a "substantial reason" for the closure. Cohen, supra at 111 (quotation omitted). A violation of a defendant's Sixth Amendment right can amount to structural error requiring reversal. Commonwealth v. Alebord, 467 Mass. 106, 112, cert. denied, 573 U.S. 921 (2014). The defendant alleges that the partial closure of the courtroom constitutes structural error that requires reversal.

We need not belabor this point because there is no evidence in the record that the courtroom was closed or partially closed. When the judge allowed the defendant's motion for funds to hire a jury consultant, she ruled that the motion was allowed "for the limited purpose of providing counsel sought by the trial lawyer outside the courtroom." The judge merely limited where the jury consultant could consult with trial counsel. See Commonwealth v. Heywood, 484 Mass. 43, 45 (2020) (affording

15

trial judge broad discretion in jury selection process).  There was no error or abuse of discretion.

Judgment affirmed.

By the Court (Vuono, Singh & Hershfang, JJ.[5]),

Clerk

Entered: April 4, 2025.

---

[5] The panelists are listed in order of seniority.